**·NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GENERAL ELECTRIC COMPANY, Respondent,**

and

**International Union of Electrical, Radio, and Machine Workers, AFL–CIO, Intervenor.**

**Nos. 337, 338, Dockets 29502, 29576.**

United States Court of Appeals
Second Circuit.

Argued June 3, 1969.

Decided Oct. 28, 1969.

Friendly, Circuit Judge, dissented in part.

Eugene B. Granof, Bethesda, Md. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison, Eugene B. Granof, N. L. R. B., on the brief), for petitioner.

David L. Benetar, New York City (David L. Benetar, Robert C. Isaacs, Michael I. Bernstein, Stanley Schair, Nordlinger, Riegelman, Benetar & Charney, New York City, on the brief), for respondent.

Ruth Weyand, Washington, D. C. (Irving Abramson, Washington, D. C., on the brief), for intervenor.

Before WATERMAN, FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge.

Almost ten years after the events that gave rise to this controversy, we are

called upon to determine whether an employer may be guilty of bad faith bargaining, though he reaches an agreement with the union, albeit on the company's terms. We must also decide if the company committed three specific violations of the duty to bargain by failing to furnish information requested by the union, by attempting to deal separately with IUE locals, and by presenting a personal accident insurance program on a take-it-or-leave-it basis.

## I.

### THE PRIOR PROCEEDINGS

In the wake of what it regarded as unsatisfactory negotiations with the General Electric Company (GE) during the summer and fall of 1960, the International Union of Electrical, Radio and Machine Workers, AFL-CIO (IUE) filed unfair labor practice charges with the National Labor Relations Board. The General Counsel, on April 12, 1961, filed a complaint alleging that GE had committed unfair labor practices in violation of sections 8(a) (1), 8(a) (3), and 8(a) (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), 158(a) (3), and 158(a) (5) (1964). Hearings were held before a trial examiner between July, 1961, and January, 1963, and included testimony, oral argument, and submission of briefs. The Trial Examiner issued his Intermediate Report on April 1, 1963, which found GE guilty of several unfair labor practices. GE and the IUE filed exceptions to the Intermediate Report, and on December 16, 1964, the NLRB agreed with the Trial Examiner. 150 N.L.R.B. 192 (1964).

There followed the race to the courthouse that is an unhappy feature too often encountered in these matters. See Carrington, Crowded Dockets and the Courts of Appeals: The Threat to the Function of Review and the National Law, 82 Harv.L.Rev. 542, 598–600 (1969). Since GE does business in every state, every court of appeals has jurisdiction, if GE's petition for review is first filed there. See 29 U.S.C. § 160(f) (1964); 28 U.S.C. § 2112 (1964). The

IUE claimed that it filed in the District of Columbia Circuit 14 seconds before GE handed its petition to the clerk in the Seventh Circuit. GE's version of course differed. The NLRB, admitting its confusion (not without reason, it would seem), suggested that since the question of timing was incapable of rational solution, the Second Circuit, where the unfair labor practices complained of occurred, would be the logical place to begin. The District of Columbia and Seventh Circuits agreed. IUE v. NLRB, 120 U.S.App.D.C. 45, 343 F.2d 327 (1965); GE v. NLRB, 58 LRRM 2694 (7th Cir. 1965). Another year was required to determine that the Union's proper status in the action was that of intervenor. NLRB v. General Electric Co., 59 LRRM 2094, 2095 (2d Cir. 1965), vacated and remanded, IUE v. NLRB, 382 U.S. 366, 86 S.Ct. 528, 15 L.Ed.2d 420 (1966), modified on remand, NLRB v. General Electric Co., 358 F.2d 292 (2d Cir.), cert. denied, 385 U.S. 898, 87 S.Ct. 201, 17 L.Ed. 2d 130 (1966). See International Union, United Auto., Aerospace, etc., Local 283 v. Scofield, 382 U.S. 205, 86 S.Ct. 373, 15 L.Ed.2d 272 (1965).

In order for the action to reach its present state of ripeness, this court consolidated GE's petition for review (No. 29576) with the Board's petition for enforcement (No. 29502). NLRB v. General Electric Co., 358 F.2d 292 (2d Cir. 1966), cert. denied, 385 U.S. 898, 87 S.Ct. 201 (1966). Another year and a half passed while the parties attempted to settle the case without recourse to further litigation. When a satisfactory settlement proved too elusive, they reentered the fray with renewed vigor, undiminished by the passage of time, two successive collective bargaining contracts (1963 and 1966), and by another suit over proper representation arising out of the 1966 negotiations. McLeod for and on Behalf of NLRB v. General Electric Co., 257 F.Supp. 690 (S.D.N.Y.), rev'd 366 F.2d 847 (2d Cir. 1966), remanded 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588 (1967). See also General Electric Co. v.

NLRB, 412 F.2d 512 (2d Cir., June 9, 1969).

## II.

### THE BARGAINING BACKGROUND

General Electric, a New York corporation, is the largest and perhaps best known manufacturer of electrical equipment, appliances, and the like. Its products—manufactured in all the 50 states—range from refrigerators to atomic energy plants, from submarines to light bulbs. In 1960, it employed about 250,000 men and women; of these only 120,000 were unionized. The IUE is an international union, affiliated with the AFL-CIO, and had a total membership of about 300,000. In 1960 it represented some 70,000 of the 120,000 unionized GE employees, formally grouped in more than 105 bargaining units, and was far and away the largest single union with whom GE dealt. The next largest, the United Electrical Workers (UE), represented only 10,000 members, and the remaining 50,000 unionized employees were split among some 100-odd other unions or bargaining agents who dealt independently with GE. A high proportion of GE employees are supervisory or managerial personnel, who are available to the company in the event of a strike.

The present action has its roots deep in the history of prior negotiations and bargaining relationships. Before 1950, the major union was the UE. In 1946, negotiations reached an impasse and resulted in a serious and crippling strike. GE eventually capitulated, and agreed to a settlement that it later characterized as a "debacle," and beyond the company's ability to meet.

GE's response came in the form of a new approach to employee relations, urged by one of its vice presidents, Lemuel R. Boulware. Although GE generally objects to use of the term, describing it as a "hostile label," the tactic of "Boulwareism" associated with his name soon became the hallmark of the company's entire attitude towards its employees.[1]

In many respects, GE's negotiating policy after the 1946 strike followed a predictable course. The Company had been concerned over the antipathy many of the employees displayed during the strike. It decided that it was no longer enough to act in a manner that it thought becoming for a "good" employer; it had to insure that the employees recognized and appreciated the Company's efforts in their behalf. The problem was perceived as a failure to apply GE's highly successful consumer product merchandising techniques to the employment relations field.

The new plan was threefold. GE began by soliciting comments from its local management personnel on the desires of the work force, and the type and level of benefits that they expected. These were then translated into specific proposals, and their cost and effectiveness researched, in order to formulate a "product" that would be attractive to the employees, and within the Company's means. The last step was the most important, most innovative, and most often criticized. GE took its "product"—now a series of fully-formed bargaining proposals—and "sold" it to its employees and the general public. Through a veritable avalanche of publicity, reaching awesome proportions prior to and during negotiations, GE sought to tell its side of the issues to its employees. It described its proposals as a "fair, firm offer," characteristic of its desire to "do right voluntarily," without the need for

---

1. Commentators are almost as widely split on the spelling of the term as they are over its merits. See, e. g., H. R. Northrup, Boulwarism (1964); Note, Boulwareism: Legality and Effect, 76 Harv.L.Rev. 807 (1963); Cooper, Boulwarism and the Duty to Bargain in Good Faith, 20 Rutgers L.Rev. 653 (1966); Gross, Cullen & Hanslowe, Good Faith in Labor Negotiations: Tests and Remedies, 53 Corn.L.Rev. 1009, 1025 (1968) ("Boulwarism"). We will follow the trial examiner in denominating the technique as "Boulwareism."

GE, while abjuring the use of the term Boulwareism, described its bargaining tactic in the early days as "the Boulware approach" in speeches to its supervisors.

any union pressure or strike. In negotiations, GE announced that it would have nothing to do with the "blood-and-threat-and-thunder" approach, in which each side presented patently unreasonable demands, and finally chose a middle ground that both knew would be the probable outcome even before the beginning of the bargaining. The Company believed that such tactics diminished the company's credibility in the eyes of its employees, and at the same time appeared to give the union credit for wringing from the Company what it had been willing to offer all along. Henceforth GE would hold nothing back when it made its offer to the Union; it would take all the facts into consideration, and make that offer it thought right under all the circumstances. Though willing to accept Union suggestions based on facts the Company might have overlooked, once the basic outlines of the proposal had been set, the mere fact that the Union disagreed would be no ground for change. When GE said firm, it meant firm, and it denounced the traditional give and take of the so-called auction bargaining as "flea bitten eastern type of cunning and dishonest but pointless haggling."

To bring its position home to its employees, GE utilized a vast network of plant newspapers, bulletins, letters, television and radio announcements, and personal contacts through management personnel.

Side by side with its policies of "doing right voluntarily" through a "firm, fair offer," GE also pursued a policy of guaranteeing uniformity among unions, and between union and non-union employees. Thus all unions received substantially the same offer, and unrepresented employees were assured that they would gain nothing through representation that they would not have had in any case. Prior to 1960, GE held up its proposed benefits for unrepresented employees until the unions agreed, or until the old contract with the Union expired.

The IUE split off from the UE in 1950, when the UE was expelled from the CIO for alleged Communist domination. Since 1950, the IUE and GE have bargained on a multi-unit basis, despite the presence of separate unit certifications for IUE locals. The pattern was continued in successive 1951, 1952, 1954, and 1955 renewal contracts. In practice, the IUE has dealt with the company through its General Electric Conference Board, composed of delegates elected from IUE locals. Under the Union constitution, the Conference Board may call strikes, make contract proposals, and conclude agreements, regardless of an individual local's consent. GE has dealt with, and recognized the status of, the Conference Board since 1950, although the national agreements frequently provided that some matters, usually minor, would be left to local agreement.

The 1955 Contract, which was to run for five years, contained a provision allowing the Union to reopen in 1958, solely on the issue of employment security. The union did so, but was unable either to gain concessions from the Company, or to elicit enough support for a strike.

## III.

## THE 1960 NEGOTIATIONS

Under the 1955 Contract, the earliest date that either party could compel the beginning of negotiations was August 16, 1960, 45 days before the end of the contract. Both sides, however, were anxious to take at least some preliminary steps before they were required to.

The IUE set up a loose alliance with several other AFL–CIO unions who bargained with GE, and they jointly polled their members on proposals. Before the actual beginning of formal negotiations, the IUE also began preparing its members through information about some of the possible demands that appeared likely to be presented to GE.

Since the linchpin of the "Boulware approach" was to bring GE's side of the story home to its employees and to the general public, it began in the latter part of 1959 to advise its Employment Rela-

tions Managers of the subjects that they should be prepared to discuss with employees. This was effected through various media, including plant publications and personal contact. General arguments in favor of keeping GE competitive through low costs, and the advantage of receiving GE benefits without having to wait for Union officials to approve them, were among the suggestions presented.

Informal meetings were first held in January, 1960, and Union and Company subsequently joined in preparing a body of information. Neither side felt any inclination to complain of want of cooperation at this stage. GE, in fact, took pains to suggest alternate information when the precise form the Union desired was unavailable.

Before another planned informal meeting in June, 1960, GE notified the IUE by letter that as of July it would institute a contributory group accident and life insurance plan for all employees, but if the Union objected, only unrepresented employees would receive the benefits. The Union protested that the Company had to bargain before making such a unilateral change, but GE insisted that the 1955 IUE–GE Pension and Insurance agreement waived all such requirements. The Union still objected, and the program was put into effect only for unrepresented employees.

At the June meeting, the Union stated its proposals, as they then stood. Without much discussion, other than some minor clarifications, Philip D. Moore, GE's Union Relations Service Manager and chief negotiator, called the proposals "astronomical" in cost, "ridiculous," and not designed for early settlement.

Following the presentation of these proposals, the early publicity phase of the Boulware approach swung into high gear. Employing virtually all media, from television and radio, to newspaper, plant publications and personal contact, the Company urged employees and the public to regard the Union demands as "astronomical" (then and later a favored Company term), and likely to cost many

GE employees their jobs through increased foreign competition. GE, on the other hand, announced it would in time make a fair and "firm" offer that would give employees no reason to allow union leadership to impose a strike. The basic theme was that the Company, and not the Union, was the best guardian and protector of the employees' interests.

The IUE also tried its hand at publicity, including an "IUE Caravan" that travelled from city to city, and occasional articles in the International Union's newspaper. In scope and effectiveness, however, they were far outshadowed by the Company's massive campaign.

From July 19 to August 11, the Union presented its specific proposals on employment security, to which the Company replied with general expressions of disapproval, or simply rejected. GE spent the next five meetings delivering prepared presentations on the general causes of economic instability, which the Union branded as a waste of time.

In subsequent meetings, the Company's posture remained unchanged. It would comment generally on some Union demands, and consider them in formulating its offer, but would not commit itself in any way. While it complained that the IUE proposals were excessive, it replied to Union requests for cost estimates with "we talk about the level of benefits," or that the proposals cost "a lot." GE would not indicate the total cost of a settlement it considered reasonable ("we talk level of benefits"); the Union in turn refused to rank its demands by priority, describing them all as "musts." Indeed the entire early period—and the later negotiations as well—were characterized by an air of rancor on both sides, which provided each with welcome opportunities to downgrade the other in communications to Union members.

GE finally revealed its own proposal informally on August 29. While expressing distress at some features of the offer, Union negotiators urged the Company to delay publicizing its "firm, fair" offer, so that its position would

not be frozen before the IUE had an opportunity to examine it and offer changes. GE refused, agreeing only to hold up most of the prepared and packaged publicity until after formal presentation of the offer on the next day.

Union officials frequently renewed their requests for cost information during the ensuing month of negotiations. GE consistently refused to estimate the cost of its proposal or of any of its elements, so that the Union might reallocate its demands. When pressed for some of the highly-touted GE cost studies, Moore frequently slipped into the "level of benefits" format, and generally showed no interest in presenting alternate information that was available and would have served the Union's needs.

There were few modifications made in the original GE offer. The Company did propose an extra week's vacation after 25 years in exchange for a smaller wage increase; but Union officials had indicated at the outset that they were uninterested in paring down what they considered an already inadequate wage offer. Despite this, and in the face of the departure by Union officials for their national conference, GE publicized the "new" offer heavily in employee communications.

After declaring late in September that the "whole offer" was "on the table," GE contrary to prior practice, brought its position home by making its three per cent wage increase offer effective for unrepresented employees before the end of the contract or IUE acceptance. Two days later GE also put its pension and insurance proposals into effect, despite IUE President James Carey's complaint that this would "inhibit" any subsequent modifications.

On September 21, Federal Mediation Service officials began to sit in on the negotiations at the request of the Union. Their presence does not appear to have measurably aided the negotiations. The Union, in response to Company complaints that the IUE proposals were too costly, submitted a written request for information on the cost per employee of the GE pension and insurance plans, as well as the number of employees who could be expected to benefit from GE's vacation and income extension proposals. The request was refused in part, and the remainder was not complied with until after the strike, when the information would be of no substantial value to the Union.

Similar difficulties confronted the Union in its efforts to change the effective date of the pension and insurance plans. The Company proposed a January 1 date for the first increase in pension and insurance benefits; the Union in turn suggested that the increase in benefits should coincide with the beginning of the contract. GE shifted its ground back and forth: first it claimed that the earlier date would be too costly; then it said that it was talking "level of benefits" and not cost; then it argued that prior contracts had always provided for pension increases on the first of the year. When this last ground proved to be incorrect, one GE negotiator promised to "consider" the October date, although he insisted the January date was "appropriate." During that afternoon, however, even this concession was withdrawn, and later explanations included describing January again as "appropriate," and "the time that you make all the resolutions for the New Year."[2]

---

2. Without trying to follow the issue through all its permutations, some of the relevant portions of the negotiating minutes went as follows:
(September 21, 1960)
 Carey (Union): * * * You change the dates of our proposal just so you wouldn't give us what we wanted.
 * * * * *

\* \* \* make the effective date of the Pension Plan October 2nd instead of January 1st.
 Willis (Company): January 1, 1961 is all right.
 Callahan (Union): You can do better than that.
 * * * * *
 Willis: Talk to Mr. Moore.

\*　\*　\*　\*　\*

(Later that day)

Moore (Company): I know you did. You would like to have it October, 1960, and we feel it should be January 1, 1961 along with the other changes.

Fitzmaurice (Union): We have people who are going to retire between October and January. They feel · that they are out in limbo.

Moore: This would apply to many people any time you set a date a particular date.

Callahan: Didn't the five-year agreement on pensions extend from the time of the agreement and not January? [The 1955 pension agreement began by the date of the overall 1955 agreement.]

\*　\*　\*　\*　\*

(September 22, 1966)

Carey: Could you bring in for the conciliators the difference in terms of the cost between what we are proposing and what you want. You know—the cost of making the effective dates different.

\*　\*　\*　\*　\*

\* \* \* We are asking you to determine the costs of making the effective dates that we suggest and the difference in yours.

Moore: Mr. Carey, we are talking level of benefits. You know that. We don't talk cost. We talk level of benefits.

\*　\*　\*　\*　\*

Willis: It is the appropriate date, Mr. Carey.

Lasser (Union): Is this your idea of collective bargaining that you listen to us and then you come to a conclusion and that is it.

Hilbert (Company): No, Dave, you know that. Unless you have something to convince us differently.

Lasser: Why that date? Why April 1962? [April was the date the Company preferred to have the second step-up in pension benefits.]

Willis: The wage structure will come up at that time and it will be changed at that time, that is why.

Carey: Wait a minute, wait a minute, wages will go up October 1, 1961. Let us make the agreement that the date the wages go in—that is the date the wages go in, the pensions go in effect at that date.

Hilbert: Let's wait and see what happens on wages—it won't be October, 1961.

Carey: All right—let's leave it on that basis. If it is based on the wage structures we can conform to those dates.

Hilbert: We can consider it.

\*　\*　\*　\*　\*

Carey: We would like to proceed to arrive at an agreement on insurance, vacations and holidays like we did on pensions. I think we have an agreement on that if Management would change the date of the pensions to the date of the wage levels, now that they said that Mr. Hilbert would consider.

Moore: Mr. Carey, we aren't taking anything under advisement for later consideration.

Carey: A Management representative said that they would take it under advisement for later consideration. Sid and Hilbert did. I think you ought to leave them alone and go on to your assignment, Mr. Moore. Maybe we can get an agreement.

Moore: Do we have that cleared up? We have nothing under advisement, Mr. Carey.

Carey: What are these fellows doing here. They said they would take it under advisement.

Moore: We aren't taking anything under advisement, Mr. Carey. It is all on the table.

Carey: Can we get an agreement on a tentative basis like we did on pensions?

Moore: We have got everything there is on the table. We have all five items in the proposal. They are on the table.

\*　\*　\*　\*　\*

On September 27, 1960, the Union raised the question of pension dates again:

Stanley (Union): I was here. Last week you said you were basing your pension date on the date that wages were made effective which was April, 1962 and if it changed you would consider.

Hilbert: Let's take first things first, Mr. Stanley.

Sigal (Union): How about the first part of the pensions and their effective date? Why aren't the pension changes effective on that date? The 1st of October, 1960.

Willis: We did make them effective the first part. We made the increase of $2.25 to $2.40 effective on January 1st.

Sigal: Where does the April, 1962 date come from?

Willis: It's the mid-point of the contract.

Sigal: If it is status that counts, what does January 1, 1961 have to do with it? That isn't the mid-point of the first part.

Union officials complained that "it is just because we request something that you would refuse to give it," and subsequent Company explanations served to support, rather than to undercut, this feeling. On September 28, with three scheduled meetings left before the end of the contract, a Union negotiator, seeking to salvage something of the earlier IUE Supplemental Unemployment Benefits proposal, suggested a local option plan under which some of the funds the Company had allocated to wage increases and its income extension offer could be diverted to supplement unemployment compensation. He was clear that nothing was to be added to the Company's costs. Moore responded, "After all our month of bargaining and after telling the employees before they went to vote that this is it, we would look ridiculous to change it at this late date; and secondly the answer is no." A few moments later Moore reiterated his belief that "we would look ridiculous if we changed it." Hilbert, for GE, later gave three reasons why the Company would not consider the proposal—and two of them were that it would make GE "look foolish in the eyes of employees and others. * * *"

GE on September 29 rejected a Union offer to maintain the status quo under the old contract until a new one was signed, specifically refusing the cost-of-living escalator clause, and stating that it would "consider" later Union-related terms such as dues checkoff. A strike (which took place on October 2, except for the Schenectady Local, which joined October 6) was clearly imminent. Although claiming to be uncertain about truce terms with national IUE negotiators, GE headquarters on September 29 authorized its Schenectady Employee Relations Manager, Stevens, to offer all the pre-existing terms of the contract (except for the cost-of-living term) to the local. Stevens did so in statements to Union members and to the local Business Agent, Jandreau. A similar offer was made to the Pittsfield local, and broadly publicized there.

By October 10, the Company (after the Union had filed an unfair labor practice charge) made the same offer to the Union's national negotiators, for any locals that returned to work. Despite rejection by the Union at the national level, the Company proceeded to deal directly with local officials, and to urge acceptance of the offer. When local officials demurred, as, for example, at Lynn, Massachusetts, publicity was aimed at the employees themselves, criticizing the local officials' stand on the "truce." Similar events occurred at Waterford, Louisville, Bridgeville, and Syracuse.

Throughout the course of the strike, GE communications to the employees emphasized the personal character of the Union leaders' conduct, and threatened loss of jobs to plants that returned to work late. Negotiations were held during the strike until October 19, when the Company declared that an impasse had been reached. During that period, GE refused to give the IUE definitive contract language until the Union had chosen which of the options it preferred, and until it gave its unqualified approval of the Company proposal.

On October 21, it became clear that Union capitulation was near. The Company, which had previously refused to delete the retraining provision from its offer, felt free to relax its position, and granted the Union's request to permit a local option on retraining. While refusing a joint strike settlement agreement, which both parties would sign, GE did propose a unilateral "letter of intent," indicating that it was in agreement with most of the Union settlement

---

Hilbert: You know it's the beginning of the year and it's the time that you make all the resolutions for New Years and all that.

Sigal: You mean all the things that you break, is that it? If you are talking about contract dates it should be October 1, 1960.

Willis: We think it is an appropriate date, Mr. Sigal.

proposals. On October 22, the Union capitulated completely, signing a short form memorandum agreement (they had not yet seen the complete contract language to which they were agreeing), and the Company alone issued its letter of intent. The strike ended on October 24.

Two matters were left open for settlement: seniority for transferred employees, and dues checkoffs. Neither, when finally settled, represented more than an adjustment to take account of NLRB decisions that rendered the original form of the agreement of dubious legality. Some minor changes also followed, none of any considerable significance.

The only other events of importance occurred at the Augusta, Georgia plant. On October 5, the plant manager sent a letter to the four employees on strike (at that time the only ones), warning them that their employment would be terminated and replacements hired if they did not return to work. On October 13, however, he sent them telegrams, retracting the earlier letter as to job termination, but indicating the replacements would be hired. More employees (twenty in all) joined the strike after October 5, and on October 24 the Company refused their unconditional offer to return to work. It did, however, give physical examinations to three of the employees, and rehired the two who passed.

IV.

THE SPECIFIC UNFAIR LABOR PRACTICES

A. *Unilateral Insurance Proposal*

On June 1, 1960, before the reopening of negotiations, but after GE had agreed to meet with the Union on June 13 to hear its proposals, the Company notified the Union by letter that it would unilaterally institute a personal accident insurance proposal. Under the Company plan, the insurance would go into effect on July 1, would be paid wholly by the employees, and would be in addition to existing insurance coverage provided by GE. If the IUE objected, GE would not offer the insurance to its members; it would, however, make it available to other employees regardless of the stand taken by the IUE.

Prior to the June 13 meeting, GE publicized the new insurance proposal, along with the information that enrollment would take place later in the month. At the meeting, the Union objected strenuously to GE's failure to bargain over the insurance, claiming that it was clearly a bargainable issue, which GE had a duty to discuss with Union representatives.

 Ordinarily, the matter would be relatively simple; it appears well settled that insurance is a mandatory subject for collective bargaining, and the employer violates section 8(a) (5) of the National Labor Relations Act by refusing to bargain over it. See NLRB v. General Motors Corp., 179 F.2d 221 (2d Cir. 1950); Inland Steel Co. v. NLRB, 170 F.2d 247, 12 A.L.R.2d 240 (7th Cir. 1948), cert. denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949) (dictum). He would, of course, also violate the Act if he unilaterally changed the conditions or terms of employment. See NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 110, 8 L.Ed.2d 230 (1962). Here, however, both the policy of section 8(d) of the Act, and the 1955 IUE–GE Pension and Insurance Agreement (which was to remain in force until October 1, 1960) affect the issue, although it is correct that section 8(d) is not by its terms applicable. Section 8(d) provides that during the term of a collective bargaining agreement neither party need:

" * * * discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract." 29 U.S.C. § 158(d) (1964).

Under the 1955–1960 Pension and Insurance Agreement, each party waived the right to require the other to bargain

as to pensions or insurance matters except during the stated renegotiation period—which, barring waiver, was months off.

Read expansively, and without any attention to the purpose of the section, the combination of 8(d) and the Pension Agreement might appear to protect any action that GE might take with respect to insurance during the term of the agreement. In Equitable Life Insurance Co., 133 N.L.R.B. 1675 (1961), however, the Board took the view that 8(d) was designed to protect the status quo; it was to be used as a shield, not as a sword.

To support this view, the Board now urges that the legislative history demonstrates that the primary purpose to be served by the relevant portion of 8(d) was to achieve "peaceful industrial relations" through stable collective bargaining agreements which guard "the right of either party to a contract to hold firm to the terms or conditions of employment specifically provided for in writing." 133 N.L.R.B. at 1689. See II Legislative History, LMRA 1947, at 1625.[3] See also NLRB v. Jacobs Mfg. Co., 196 F.2d 680, 684 (2d Cir. 1952). Indeed, a convincing *reductio ad absurdum* argument can be made that any other reading would construe 8(d) and the contract provision as permitting GE to make any modifications in the insurance terms that it sees fit—for example to increase or decrease its contribution to the existing policy—all without any consultation with or recourse for the Union. Section 8(d), the argument would run, covers "any modification," which would include a decrease in benefits. Such a construction is patently unsupportable; it would simply destroy the stability of the agreement that 8(d) is designed to protect. Moreover, viewing this as a matter of contractual interpretation, it seems highly unlikely that the Union would have ever considered such a clause.

An argument more reasonable superficially is that the Company might add to the agreement through unilateral action, but could not subtract from it. In a sense, of course, the difference is illusory. A collective bargaining agreement is a compromise not only between the parties, but of their past, present, and future goals. An insurance agreement that covers particular risks, in a specified way, impliedly rejects other risks, and other methods. Specifically, a Union may always oppose insurance plans to which its employees contribute, believing that the tax benefits of non-contributory plans to its members—and often to the company—in the long run will outweigh any present gains. Or, it may believe that it is important to keep insurance benefits within narrow bounds, so that at the next negotiating session it will be able to press more vigorously for other benefits. In this sense, then, even "additions" to the insurance agreement subtract from the basic compromise that the agreement represents.

Yet even if we were to ignore this threshold difficulty, there are serious objections to permitting one party to an agreement unilaterally to hold out this type of inducement to the other. It creates divisive tensions within the Union; employees with hazardous occupations will favor the proposal, while those with routine tasks will object. Whichever way the Union moves, it loses ground with some part of its constituency. Union democracy is not furthered by permitting the Company to pick the Union apart piece by piece. The same point may be made where there are both union and non-union employees. If the Union refuses the benefit, then it may appear, at least in the short run, to have disadvantaged its members vis-à-vis non-members. Thus it may be forced to sacrifice long-term goals to avoid short-term dissatisfaction.

3. "It [section 8(d)] merely provides that either party to a contract may refuse to change its terms or discuss such a change to take effect during the life thereof without being guilty of an unfair labor practice." II Legislative History of the Labor Management Relations Act (Taft-Hartley Act) 1947, at 1625 (remarks of Senator Taft).

In the context of this case, where the Company's tactics seemed so clearly designed to show the employees that the Union could win them nothing more than the Company was prepared to offer, it is even more apparent that a unilateral offer—over which the Union may not bargain—diminishes the rewards and the importance of the bargaining at the end of the contract period. Thus the Union's ability to function as a bargaining representative is seriously impaired. Indeed, such conduct amounts to a declaration on the part of the Company that not only the Union, but the process of collective bargaining itself may be dispensed with. Cf. Equitable Life Ins. Co., 133 N.L.R.B. 1675, 1693 (1961).

A far more subtle argument on behalf of the Company concentrates on the effect the *Equitable* rule has on non-Union employees. This line of thought suggests that the employer can always grant unilateral benefits to non-Union employees. If he were forbidden to do so whenever some of the employees chose a Union as their bargaining representative, then the Union would in effect have the ability to prevent non-Union employees from making an independent choice on benefits. In fact, the argument goes, he would be denying the unrepresented employees their right to refuse to be represented by the Union, and would thus be committing an unfair labor practice. See § 7, 29 U.S.C. § 157 (1964) ("Employees * * * shall also have the right to refrain from any or all of such activities * * *"); § 8(a) (1), 29 U.S.C. § 158 (a) (1) (1964) (making violations of § 7 an unfair labor practice).

There are two answers to this argument. Section 8(a) (3), 29 U.S.C. § 158 (a) . (3) (1964), forbids discrimination in terms of employment that discourage or encourage union membership. Were GE unilaterally to give only non-Union employees a cash bonus, it would be violating the policy of section 8(a) (3), if its aim were to disparage the Union. Under some circumstances, in fact, its subjective state of mind would be wholly irrelevant. See Note, Labor Law—The Decreasing Importance of Employer Motivation as an Element of Unfair Labor Practice, 46 North Carolina L.Rev. 975 (1968). Hence it is not by any means clear that an employer may give benefits to non-union employees whenever he wishes; his freedom, and that of the non-union employees, is limited by section 8(a) (3).

Moreover, *Equitable* hardly says that an employer like GE may not offer to increase benefits during the term of the contract; rather, its thrust is that if an employer wishes to do so, he must be prepared to bargain with the union. The Act can hardly be read to require less.

GE attempts to distinguish *Equitable* by urging that only section 8(d) and not a contract provision was at stake in that case, and the employer attempted to capitalize on the dilemma it created for the union. The first ground is unconvincing. GE does not direct us to circumstances indicating a desire by the parties to the collective bargaining agreement to do more than invoke the protections of section 8(d). Indeed, the Company described the contract language as "the standard 8(d) clause." [4]

4. Title 1, Section 4 of the IUE–GE 1955 Pension and Insurance Agreement provided in part:
"* * * each of the parties voluntarily and unqualifiedly hereby waives any and all rights to require that the other party or parties hereto bargain collectively during the term of this Agreement, with respect to any such subjects or matters whether or not such matters are covered by this Agreement. * * *
The Union and Locals agree that, during the term of this Agreement, there

shall be no strike, slowdown, sitdown, or other form of stoppage of work arising out of or conducted in connection with any effort to induce modifications of or amendments or additions to the insurance and pension benefits provided for by this agreement. * * *"
Despite the extremely broad language of the first paragraph, the language of the second—"to induce modifications of or amendments or additions to the insurance agreement"—seems rather clearly to indicate that this clause, like section 8(d),

Although the Trial Examiner found that GE did not attempt to capitalize on the IUE's refusal to accept the personal accident insurance proposal, this case is not distinguishable from *Equitable*. The employer's attempt to use the Union's plight to its own advantage was not a determinative factor there. The dilemma created by an employer exists whether he uses it crudely or subtly; it is inherent in a take-it-or-leave-it bargaining approach. True, GE did not capitalize on the Union's refusal; but through its enrollment program late in June, and by the unavoidable controversy that the issue itself raised in Union ranks, the Company was able to profit from the situation without exploiting it outright. The rationale of the Board's *Equitable* rule reaches at least that far. Once it is clear that the party who disrupts the status quo cannot rely on section 8(d) to protect his conduct, then unilateral action over a mandatory matter, joined to a refusal to bargain, represents a straightforward rejection of the collective bargaining principle in fact. See NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962).

Lastly, GE urges that since the *Equitable* decision was not filed until 1961, it should be found blameless, since it did not know that its conduct was proscribed.[5] Of course, it is also true that the conduct, although not yet proscribed, had not been judged proper either, and indeed, Equitable Life Insurance Company itself stands on the same footing with GE in that respect. In any event, parties who make a practice of stretching the statutory fabric to the breaking point should not be surprised when the cloth gives way. Cf. NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) (condemning "brinkmanship").

### B. *Refusal to Furnish Information*

It is conceded that in the prenegotiation period GE was quite cooperative in aiding the Union to secure information. GE submits that it spent over $100,000 in fulfilling Union requests. Indeed, in several instances where the necessary data was too costly to obtain, or was unavailable, GE suggested a substitute, which substantially satisfied the Union's needs without straining the Company's resources.

Once formal negotiations were underway, however, GE's attitude changed markedly. A pattern gradually began to develop in which the Union would propose a particular benefit, Company negotiators would label it as "astronomical," or "costly," and when pressed by the Union for figures to back up their cost criticisms, would respond with "we talk level of benefits, not costs."

---

was for the benefit of the party attempting to maintain the status quo, and not the party seeking to unsettle it.

The NLRB may interpret such a contract during the course of an unfair labor practice hearing, where the question is whether the union waived a statutory safeguard. NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

5. GE cites Columbine Beverage Company, 138 N.L.R.B. 1297 (1962), for the proposition that it might avoid an unfair labor practice finding by relying on a pre-existing NLRB ruling. In *Columbine* an employer refused to bargain with a unit at a time when the NLRB considered the unit appropriate. After the union filed unfair labor practice charges, the Board in another case decided that the unit was not an appropriate one. The NLRB held that since his conduct was illegal at the time that it occurred, the employer could not rely on the later NLRB decision to purge itself, and thus sustained an unfair labor practice finding.

Here, however, there was no outstanding ruling that an employer might propose new terms to a collective bargaining agreement on a take-it-or-leave-it basis; *Equitable*, decided a year later, was a case of first impression. More to the point, *Columbine* merely held that later decisions would not be a defense to charges based on law in effect at the time that the conduct occurred. GE apparently is assuming that the converse principle is necessarily true—indefensible in logic, and with a nod to Justice Holmes, equally so in law.

There were times when the format changed, but the result remained relatively the same. On occasion, the Company might suggest one set of employment security provisions, which the Union did not like. When the Union indicated that it preferred its proposals to the Company's, the Company responded that the Union alternates were too costly. GE refused to indicate the cost of Union proposals, or how much it was willing to expend, so that the Union might recast its demands. The following exchange is not atypical:

> Swire (Union): We are asking for an improvement in maternity. We want the Company to pay everything up to $550, then co-insurance after that.

> Willis (Company): Something like that is out of reach. Maternity is the most expensive item.

> Swire: What does it cost, Sid?

> Willis: We talk level of benefits, not costs.

The cases that have dealt with the difficult problem of giving meaning to "bargaining in good faith" are instructive. In NLRB v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), the company claimed that a wage increase of over 2½ cents per hour would put it out of business, but refused to furnish the Union with any indication of its financial status. The Supreme Court, in finding that the Company had committed an unfair labor practice, commented,

> "Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to pre-

sent in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." 351 U.S. at 152–153, 76 S.Ct. at 755–756.

See also NLRB v. George P. Pilling & Son Co., 119 F.2d 32 (3d Cir. 1941); NLRB v. Western Wirebound Box Co., 356 F.2d 88 (9th Cir. 1966).

Moreover, it is not always necessary that the Company put the cost of its proposals in issue, or even refuse Union demands on the ground that they are too costly. In Sylvania Electric Products, Inc. v. NLRB, 358 F.2d 591 (1st Cir.), cert. denied, 385 U.S. 852, 87 S.Ct. 87, 17 L.Ed.2d 80 (1966), the court decided (without raising the issue of cost justifications by the company) that pension and insurance costs (which it labeled "collateral" issues) should be made available to the Union where it wished to weigh the value of such plans against an increase in take-home pay.[6] This is particularly true, of course, where the Company contributes to the plan, thus in effect substituting it for wages.

■ The rationale of these opinions seems obvious; if the purpose of collective bargaining is to promote the "rational exchange of facts and arguments" that will measurably increase the chance for amicable agreement, then sham discussions in which unsubstantiated reasons are substituted for genuine arguments should be anathema. See Cox, The Duty to Bargain in Good Faith, 71 Harv. L.Rev. 1401 (1958).

The Board and the Trial Examiner relied on two specific instances of refusal to furnish information to substantiate their unfair labor practice charge. The first was an oral request by the Union

---

6. GE argues that a prior decision of the First Circuit, Sylvania Electric Products, Inc. v. NLRB, 291 F.2d 128 (1st Cir.), cert. denied, 368 U.S. 926, 82 S.Ct. 360, 7 L.Ed.2d 190 (1961), denied discovery of such information for a noncontributory plan and thus demonstrated that the state of the law was, at the very least, highly unsettled. In the first *Sylvania* case, however, the court was careful to indicate

that if the Company interposed a cost objection to a Union proposal—as here—the Union might be entitled to the cost figures, citing *Truitt*. In any event the second *Sylvania* case expressly distinguished the first almost to the point of extinction by permitting the Union to demand cost information wherever the Union sought to weigh the value of different possible wage-benefit packages.

on August 24 for the number of employees with one year, and with twenty years, of service, so that the Union might determine the cost of its demand for a fourth week of vacation for employees with 20 or more years of service. Carey later pointed out that this request was in response to the Company's labelling the Union's vacation plan as "astronomical." Hilbert, for GE, stated that the Company did not have the information; on August 31 Moore responded that GE was discussing "the level of benefits."

The second refusal to furnish information relied upon occurred in September. When the Union, on September 8, sought to evaluate the number of employees who would have benefited from the Company's Income Extension Aid proposal, had it been in effect for the past two years, Moore responded, "Somewhere between zero and 100 per cent." Later in the month, on September 22, the IUE put this and other requests for information in writing, and submitted them to GE. Like the original August oral request,

the cost information the Union wanted was put in issue by the Company's repeated references to cost as a justification for rejecting Union proposals, or as a reason for preferring Company plans.[7] GE also frequently couched its objections to Union demands on the ground of "competition," thereby implying that the cost of the IUE proposals was a material element in its considerations. See United Steelworkers of America, AFL–CIO, Local 5571 v. NLRB, 130 U.S.App.D.C. 369, 401 F.2d 434 (1968); NLRB v. George P. Pilling & Son Co., 119 F.2d 32 (3d Cir. 1941).

The September 22 letter requested basically five categories of information: (A) cost per employee of proposed insurance benefits; (B) cost per employee of proposed pension benefits; (C), (D) number of employees likely to benefit from the Company's income extension aid (IEA) program; (E) number of employees with 20 or 25 years of continuous service.[8] The last request, like that made

---

7. For example, on August 31, GE negotiators rejected the Union's SUB proposal as "an expensive item," but then refused to value its own income extension aid (IEA) proposal because "we haven't figured it out yet," but SUB "would cost a lot more." Similar discussions occurred over pensions, insurance, wages, and the cost-of-living escalator clause that the Company wanted dropped from the new contract.

8. The text of the letter was as follows:

September 22, 1960

Mr. Philip D. Moore, Manager
Employee Relations Service
General Electric Company
570 Lexington Avenue
New York 22, New York
Dear Sir:

We have made oral requests several times, since General Electric announced its contract proposals on August 30, 1960, for information necessary for intelligent bargaining on this matter. The requests were rejected.

In order that we may be in a position to appraise the cost of your proposals, and to determine the number of people who might benefit by them, we renew our request for the following information with respect to the employees in each of

the General Electric bargaining units represented by the Union and its locals:

A. Cost per employee, and also for employee dependents, of each proposed new insurance benefit, and of each proposed increment in existing benefits, broken down into

(1) cents per month premium, and
(2) cents per month net cost estimated on basis of the Company's 1959 experience.

B. Cost in cents per hour per employee of the proposed increment in each of the pension benefits.

C. Number of employees on the Company's recall list as of June 30, 1960, for

(1) less than 6 months;
(2) more than 7 months and less than one year;
(3) more than one year.

D. Number of employees who have been recalled since January 1, 1960, and who, prior to their recall, had been laid off

(1) less than 6 months;
(2) more than 6 months and less than one year;
(3) more than one year.

E. Number of employees with [following handwritten to semi-colon]

orally on August 24, was designed to test the Company's assertion that an extra week of vacation after 20 years would be too expensive, and that one after twenty-five years would be preferable.

Addressing ourselves first to the oral request of August 24, GE never did reply until it answered the same question, posed under "E," above, after the strike was over. While there is some dispute over whether the Union orally requested the information for the whole Company or for IUE units alone, there is no disagreement that GE had the figures available on a company-wide basis.

■ Even if we were to assume that the Union had asked for figures for IUE units alone, GE's failure to provide the information is inexcusable. The Trial Examiner appropriately found that GE could readily have obtained the data from local plants, and even had it been unwilling to do so, it could, at a minimum, have informed the Union that it had the information available on a company-wide basis, which the Union probably would have found just as useful (since GE indicated that it would put the same benefits into effect for all employees, pursuant to its uniformity policy). Thus, under the most favorable interpretation of the facts, GE's offhanded refusal to submit information on an issue which it had itself raised, would amount to an unfair labor practice. This conclusion is fortified by GE's behavior in the prenegotiation meetings, when it demonstrated that it was capable of providing information —indeed even suggesting that it be provided—in a form different from that originally desired. If we were to hold that because the information requested did not conform precisely to the data in the possession of the Company, an em-

ployer might refuse to provide any data at all, we would, in our view, be taking a step backwards, towards incorporating all the worst features of the ancient common law pleading system into our present-day labor negotiations. GE seems to suggest that even an insignificant variance between the request and the available information would be a complete bar to the Union—even though it was utterly unaware of the precise form in which the Company kept its records, and the Company refused to enlighten it. In a day when liberal pleadings, liberal discovery, and modern rules of evidence have largely supeseded ancient formalism, grafting such a pointless and dysfunctional rule onto negotiating procedures is clearly out of place.

■ GE did finally respond to item "E", as well as items "C" and "D" in the September 22 letter, on November 7, after the strike had been settled and the contract agreed upon.[9] All three of the requests required that the Company collect information from its local plant managers; GE, however, waited until October 24 to initiate the collection process. The Company also claims that mass picketing, violence, and problems of shutting down struck plants forced it to delay. But, as the Trial Examiner pointed out, this retrospective explanation fails to explain the initial delay of a week, before the strike began. The Trial Examiner, who had the opportunity to observe and evaluate the testimony, refused to credit this explanation. Finding that his conclusion (adopted by the Board) is supported by substantial evidence (and is not vigorously contested by the Company), we conclude that the Company committed an unfair labor practice by failing to provide the information, highly

(a) 20 years;
(b) 25 years or more continuous service.

We would appreciate having this information without delay.

Very truly yours,
/s/ JAMES B. CAREY
James B. Carey
President

9. The Company also answered with a letter on September 28, which refused items A and B as "speculative," indicated that C and D "would take some time" and answered that portion of E relating to 25 years of service, but not that for 20 (despite the fact that the latter request had been made orally more than a month earlier).

relevant to the negotiations, within a reasonable time. See NLRB v. Fitzgerald Mills Corp., 313 F.2d 260 (2d Cir.), cert. denied 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed. 2d 64 (1963); Utica Observer Dispatch, Inc., 111 N.L.R.B. 5863, enforced 229 F.2d 575 (2d Cir. 1956); Reed & Prince Mfg. Co., 96 N.L.R.B. 850, enforced 205 F.2d 131 (1st Cir.), cert. denied 346 U.S. 887 (1953). See also section 10(e), 29 U.S.C. § 160(e) (1964); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (Frankfurter, J.).

Items A and B, mentioned in the September 22 letter—the estimated per employee pension and insurance data—were never provided by the Company. It insisted that it was not legally required to disclose the cost of fringe benefits to it, and that in any case the information was so "purely speculative" that compiling it would be both burdensome and valueless. The first contention seems clearly wrong. In order for the Union to assess properly the Company's objections to some of its proposals, and to understand which of GE's objections to cost were soundly based, the IUE had to have the basic data on which to make informed choices.

A union weighing wages against benefits, or one form of benefit against another, should receive answers to its genuine non-burdensome requests for cost information. If the Union were denied such data, it would be unable to bargain intelligently, and arrive at sensible and reasoned decisions, particularly those involving reallocation of benefits within GE's cost framework. Even the first *Sylvania* decision indicated that when the employer (as here) puts cost in issue, or the discussion involves a contributory plan (as here), the Union may be entitled

to cost information. See also note 6, *supra.*

■ The Company further urges that since the Trial Examiner found that some of the information would have been difficult or expensive to obtain in the form requested, it need not have provided it. But GE had most of the information in some form that would have been useful to the Union, and easily could have either presented it in that form, or at least advised the Union that it had other relevant information (like the C, D, and E data) available. The objection is unavailing.

■■ The last major claim is that future pension and insurance costs were "purely speculative" and only "educated guesses." The difficulty with this stand is that it would excuse the Company from furnishing virtually all information of which it was not absolutely certain. In bargaining, as in most other circumstances, it is the use to which the information is put that should determine the degree of accuracy that is required. The root question, as posed in the second *Sylvania* case, is whether the data "would significantly aid in the bargaining process." 358 F.2d at 592. There can be no question that the information available would have assisted the Union here; GE committed an unfair labor practice in withholding it.[10]

### C. *Bargaining Directly with Locals*

As we have pointed out above, GE and the IUE had a consistent pattern of national negotiations for over ten years before the 1960 strike. There can be little doubt that the Board's finding that GE recognized and dealt with the IUE-GE Conference Board as representative

10. A last claim, like that made in the take-it-or-leave-it personal accident insurance unfair labor practice, is that bad faith could not be found since GE under then-existing precedents could not have known that its conduct would be found wanting. It deserves the same reply. What has been said should indicate that GE's reliance on the first *Sylvania* case is misplaced, particularly where the Union's need was clear, and the Company's refusal not attributable to a legitimate concern other than doing the minimum that the law required.

of all IUE locals was both supported by substantial evidence and correct.[11]

Once the strike was imminent, however, GE abandoned this pattern, and dealt separately with several of the IUE locals. On September 29, GE notified the IUE at their bargaining meeting that after October 1, it would consider its contractual obligations at an end; it would continue current wages, benefits, and seniority, but such union-related matters as dues checkoff, grievance time pay and superseniority for union officials, would have to be "considered."

That same day, however, GE headquarters authorized their local Employment Relations Manager, A. C. Stevens, in Schenectady to offer more to the local there than had been offered to the national negotiators, if Schenectady Local 301 stayed at work. Specifically, all the union-related provisions of the old contract—dues checkoff and the like—were to remain in effect, while at the national level, GE had committed itself only to "consider" them. On October 4, Stevens wrote to Leo Jandreau, Local 301's business agent, stating:

> "We agree to extend to you protection of the recent contract, including grievance machinery, protection covering working conditions, seniority, prices, wage rates, and any other condition of employment recited in the contract. Current cost-of-living adders will remain in effect. We will continue union representation recognition as presently constituted and all the above will remain in effect so long as we are not on strike."

On the same day, the local Employee Relations Manager at Pittsfield made a similar offer, containing the same truce conditions, which was broadly publicized.[12] The IUE then filed an unfair labor practice charge, based on the offers to the locals. Several days later (about October 10), GE offered the same terms to the national negotiators.

On the day the Company made its Schenectady-Pittsfield terms available to the IUE generally, the Lynn, Massachusetts Employment Relations Manager, Robert Burns, wrote to Lynn Local 201's Business Agent, and proposed:

> " * * * we meet to work out a memorandum of intent which would re-establish for all employees represented by Local 201 all of the provisions which were in the contract * * * which * * * would go into effect when Local 201 terminates the strike in Lynn while contract negotiations continue."

At Waterford, a similar proposal was made to the local Business Agent, and union members were telephoned by their foremen and urged to convince their local officers to accept the return to work proposal.

At Louisville, Kentucky, the Employee Relations Manager forwarded a copy of the Company's October 10 proposal along with a noncommittal letter to the Local Business Agent indicating that the copy might be "helpful" in removing the "confusion" over how employees might return to work. The Bridgeville, Pennsylvania Employee Relations Manager also forwarded a copy of the proposal, but he in addition added that he was

> " * * * suggesting it to you and other Local 640 officials as a means of permitting local members to return to their jobs and to continue to earn their

11. At Louisville, Waterford, and Bridgeville, the IUE itself was certified as the bargaining agent; at Schenectady, Syracuse, Lynn, and Pittsfield, individual locals were certified. However, by reason of consistent past practice, GE was obliged to treat the IUE-GE Conference Board as the representative of all.

12. GE claimed that the Pittsfield Local initiated the discussion of truce terms.

The Trial Examiner, who had the opportunity to observe the witnesses, disbelieved this testimony, and the Board sustained him. We are unable to say that his finding is unsupported by substantial evidence; in any case, it should not matter who initiates the dealing. See Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 683, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

wages, until a settlement agreement is reached."

At Syracuse, in a phone conversation between the Local President and the Union Relations Manager, the Manager not only suggested accepting the terms now offered to the IUE nationally, but indicated that the President and several other Syracuse employees could have their alleged strike misconduct suspensions lifted if they returned to work.

The Trial Examiner and the Board agreed that in each instance GE committed an unfair labor practice when it went behind the backs of the national negotiators and offered separate peace settlements to locals. Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 64 S.Ct. 830 (1944) sustains this conclusion. In *Medo*, several employees who appeared to represent a majority met with their employer to express their dissatisfaction with the union representing them. They offered to abandon it if their wages were increased. When the Employer treated with the dissenting employees, the Court held, he violated section 9(a) of the Act, 29 U.S.C. § 159(a) (bargaining representatives of the union are "exclusive"). Therefore, he committed unfair labor practices under sections 8(a) (1) and 8 (a) (5), 29 U.S.C. §§ 158(a) (1), 158 (a) (5) (1964). *Medo* instructs that it does not matter who initiates the bypassing of the bargaining representatives. 321 U.S. at 683, 64 S.Ct. 830. Subsequent cases appear to have applied the doctrine even where the offer to the local or to the employees was no better than that made to the bargaining representative. See, e. g., Independent Stave Co. v. NLRB, 352 F.2d 553 (8th Cir. 1965), cert. denied, 384 U.S. 962, 86 S.Ct. 1558, 16 L.Ed.2d 674 (1966) (by implication). We have, under similar circumstances, condemned efforts by an employer to take a matter up with his employees, where their bargaining representative had already taken a stand on the matter. Utica Observer-Dispatch v. NLRB, 229 F.2d 575 (1956). But cf. NLRB v. Penokee Veneer Co., 168 F.2d 868, 4 A.L.R.2d 1350 (7th Cir. 1948).

The terms offered at Schenectady and Pittsfield were in fact better than those made available to the national negotiators. There can be no question but that such offers clash with the *Medo* rationale, for they cut deeply into the Act's command that bargaining representatives be "exclusive." See § 9(a), 29 U.S.C. § 159(a) (1964). The Company's claim that it had to "clarify" its position to the Schenectady management so that they would know what terms to effectuate if the local there came to work ignores the fact that it was the Company's vagueness on return to work provisions that caused the need for clarification. In any case, the additional union-related terms should have been offered to the national negotiators for their consideration before—or at least at the same time that—they were given to the locals; yet GE waited until the Union had filed an unfair labor practice charge to do so. We agree with the Board that GE committed an unfair labor practice by failing to respect the IUE–GE Conference Board's status as exclusive bargaining representative.

The other proposals complained of occurred after October 10, and so there is no question (with the possible exception of Syracuse) of offering more to the local than to the national negotiators. Yet, as we have suggested, this factor cannot be dispositive. The vice that *Medo* sought to avoid was the practice of undermining the authority of the union's bargaining representatives through direct dealings with the locals or employees they represented. Such tactics are inherently divisive; they make negotiations difficult and uncertain; they subvert the cooperation necessary to sustain a responsible and meaningful union leadership. The evil, then, is not in offering more. It is in the offer itself.

At Lynn and Waterford it is clear that the employment managers were proposing that they and the local make a separate settlement. At Lynn, GE even offered a separate "letter of intent." Bridgeville is similar, and though the

evidence is not so strong, the Board might reasonably have found that the manager there was suggesting an independent settlement. The offers of reinstatement at Syracuse place that proposal as well in the forbidden category, for they indicate that an individual settlement was being held out to the local.

■ At Louisville, however, the only indicia the Board relies on pointing to a separate agreement, or to treating separately with the local, is the fact that the letter was addressed to the local's president. A fair reading of the brief missive, however, fails to disclose that it had anything more than an informational purpose, giving the content of the proposal made at the national level previously. The basic distinction is between attempting to reach a separate settlement with the local—as at Schenectady—and keeping the local informed of Company positions. In circumstances such as these, the interest in free speech and informed choice must prevail over the slight possibility that the representatives' positions might be undermined, and thus we believe the Board's finding is unsupported by substantial evidence. See NLRB v. Penokee Veneer Co., 168 F.2d 868 (7th Cir. 1948). Cf. Linn v. United Plant Guard Workers of America, 383 U.S. 53, 62, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966) (favoring "uninhibited, robust" debate).

## V.

## OVERALL FAILURE TO BARGAIN IN GOOD FAITH

■ We now approach the most troublesome and most vigorously contested of the charges. In addition to the three specific unfair labor practices, GE is also charged with an overall failure to bargain in good faith, compounded like a mosaic of many pieces, but depending not on any one alone. They are together to be understood to comprise the "totality of the circumstances." Despite my brother Friendly's distaste for the term, past decisions have indeed emphasized that good faith—or lack of it—must in the absence of a per se violation depend upon a factual determination based on the overall conduct of the party charged. See NLRB v. Insurance Agents' Union, 361 U.S. 477, 498, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960); NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). The Board can hardly be faulted for resting its finding on a ground that the Supreme Court has mandated. Certain specific practices, such as making unilateral changes in working conditions during bargaining, can be found to constitute per se violations of the duty to bargain, since they constitute a "refusal to negotiate in fact." See NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). When such conduct is present, the Board need make no finding that the totality of the party's conduct manifests bad faith; the practice itself is conclusive on that issue.

■ The Board, however, chose to find an overall failure of good faith bargaining in GE's conduct. Specifically, the Board found that GE's bargaining stance and conduct, considered as a whole, were designed to derogate the Union in the eyes of its members and the public at large. This plan had two major facets: first, a take-it-or-leave-it approach ("firm, fair offer") to negotiations in general which emphasized both the powerlessness and uselessness of the Union to its members, and second, a communications program that pictured the Company as the true defender of the employees' interests, further denigrating the Union, and sharply curbing the Company's ability to change its own position.

The Board relies both on the unfair labor practices already discussed and on several other specific instances to show that GE had developed a pattern of conduct inconsistent with good faith bargaining. It points to GE's proposed personal accident insurance proposal on a take-it-or-leave-it basis as an example of an attempt to bypass the Union, and an attempt to disparage its importance and usefulness in the eyes of its members. GE's response to this is that the *Equitable* case had not been decided in

1960. Therefore, it argues, its actions were based on a "justifiable belief" in the state of the law at that time and cannot support the view that the Company was motivated by bad faith.

This reasoning overlooks the principle that acts not in themselves unfair labor practices may support an inference that a party is acting in bad faith. See NLRB v. Insurance Agents' Union, 361 U.S. 477, 506, 80 S.Ct. 419 (1960) (Frankfurter, J., concurring). While GE may have believed that it was acting within its "rights" in offering a take-it-or-leave-it proposal, doing so may still be some evidence of lack of good faith. Here there was no substantial justification offered for refusing to discuss the matter, other than a niggling—and incorrect—view of the contract and the statute. Cf. NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131 (1st Cir.) (Magruder, J.) ("must make *some* reasonable effort in *some* direction"), cert. denied 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). Given the effects of take-it-or-leave-it proposals on the Union, already set forth in our review of the specific unfair labor practice charges, the Board could appropriately infer the presence of anti-Union animus, and in conjunction with other similar conduct could reasonably discern a pattern of illegal activity designed primarily to subvert the Union.

We have already discussed at length the Company's failure to furnish information. As in the instance of the personal accident insurance proposal, GE's attitude on information was characterized by a pettifogging insistence on doing not one whit more than the law absolutely required, an insistence that eventually strayed over into doing considerably less. GE's conduct, as the Board's opinion points out, was all of a piece. It negotiated, to the greatest possible extent, by ignoring the legitimacy and relevance of the Union's position as statutory representative of its members. Thus it is hardly surprising that IUE requests for information were met (at least once negotiations had begun) with less than enthusiasm, for they reflected the Union's contrary belief that it had to know the worth of the Company proposals in order to evaluate them for its members.

GE's reluctance to part with information was not limited to the specific instances complained of as an unfair labor practice. The record discloses that even before the general reopening of negotiations, GE displayed a patronizing attitude towards Union negotiators inconsistent with a genuine desire to reach a mutually satisfactory accord. During the early meetings devoted to employment security, GE's responses to the Union's detailed proposals were vague and uninformative, hardly calculated to apprise the IUE of GE's stand on any of the matters about which it wanted to negotiate. When the Union finished presenting its plan, GE, instead of offering counter-proposals, or commenting specifically on the IUE's suggestions, offered a prepared lecture series on the general causes of economic instability, a response not at all designed to enlighten the Union on specific bargainable matters. This impression is reinforced by Moore's consistent refusal to permit the lecturing Employee Relations Managers to answer specific Union inquiries.

More crucial, perhaps, was the Company's persistent refusal, after publicizing its proposal, to estimate not only the cost of components of its offer, but the total size of the wage-benefit package it would consider reasonable. Responses such as "it hasn't occurred yet" were interposed when IUE negotiators asked for estimates of the GE offer; yet the trial examiner found (as GE's bargaining philosophy required) that considerable cost studies had in fact been made, which would have been of substantial assistance to the Union. Without an estimate of the overall size of GE's offer, the Union was hamstrung in its efforts to decide which substitutions were reasonable, whether to press for more total benefits, or how much redistribution could be accomplished within GE's cost framework.

In addition to its reluctance to make meaningful cost disclosures, GE occasionally took untenable and unreasonable positions and then defended them, with no apparent purpose other than to avoid yielding to the Union. The most flagrant example occurred in setting the date for the beginning of pension and insurance benefits. As indicated in our opening discussion of the negotiating background, GE vacillated back and forth, chose inconsistent and confusing explanations at random, interposed some inconsequential attempts to pass the problem off with banter, and finally settled by characterizing the date it had chosen as "appropriate." See note 2 *supra,* and accompanying text. Certainly, GE could insist on any dates that it desired—but its manner of responding to Union inquiries reflected its philosophy of "bargaining."

When the last act was virtually played out and it had become apparent that the Union would have to end its abortive strike and concede to GE's terms, the Company continued to display a stiff and unbending patriarchal posture hardly consistent with "common willingness among the parties to discuss freely and fully their respective claims and demands and, when these are opposed, to justify them on reason." NLRB v. George P. Pilling & Son Co., 119 F.2d 32, 37 (3d Cir. 1941). With the Union, as it were, "on the ropes," the Company insisted that IUE choose the options that it preferred, and assent to the contract unconditionally, without ever seeing the final contract language. When the Union protested that the memorandum proposed for its signature was too vague, the Company refused to submit more definite language. Four days later, the Union capitulated completely and signed the short form memorandum, still without having seen the final contract to which it was agreeing.

In a similar vein the Company rejected the notion of a bilateral strike settlement agreement. Instead, it proffered a unilateral "letter of intent." While again, it is true GE did not have to sign a joint settlement agreement, it gave no reason for refusing to do so (other than that this had been its past practice). The Board might reasonably infer that its prime purpose was to avoid recognizing the Union's status as bargaining representative of the striking employees, and not to further any legitimate business aim.

GE argues forcefully that it made so many concessions in the course of negotiations—concessions which, under section 8(d), it was not obliged to make—that its good faith and the absence of a take-it-or-leave-it attitude were conclusively proven, despite any contrary indicia on which the Trial Examiner and the Board rely. The dissent proceeds under the misapprehension that we consider lack of major concessions as evidence of bad faith. Rather, we discuss them only because while the absence of concessions would not prove bad faith, their presence would, as GE claims, raise a strong inference of good faith. On close examination, however, few of the alleged concessions turn out to have a great deal of substance. Its offer of a wage reopener accompanied its original proposal; the option to choose a vacation instead of a wage increase was included over the Union's objections (at least during the negotiating meetings), and changes in the Pension Plan were more in the nature of clarifications than actual shifts in position, or in any case involved issues of quite minor significance.[13]

13. For example, to describe the reduction in Union representatives' pension contributions as a "concession" as the dissent urges, seems inappropriate. GE simply indicated that it would conform its deductions to the actual 1960 actuarial estimates, rather than the higher (and by 1960 incorrect) 1955 assumptions.

As to "yielding" on Exclusion K, the Company, in response to a Union request, revealed that it had *already* revised its health insurance proposal to provide payments to employees insured under other contributory group medical coverage. More simply put, the Company on its own motion (or possibly, although not cer-

The Company's stand, however, would be utterly inexplicable without the background of its publicity program. Only when viewed in that context does it become meaningful. We have already indicated that one of the central tenets of "the Boulware approach" is that the "product" or "firm, fair offer" must be marketed vigorously to the "consumers" or employees, to convince them that the Company, and not the Union, is their true representative. GE, the Trial Examiner found, chose to rely "entirely" on its communications program to the virtual exclusion of genuine negotiations, which it sought to evade by any means possible. Bypassing the national negotiators in favor of direct settlement dealings with employees and local officials forms another consistent thread in this pattern. The aim, in a word, was to deal with the Union through the employees, rather than with the employees through the Union.

The Company's refusal to withhold publicizing its offer until the Union had had an opportunity to propose suggested modifications is indicative of this attitude. Here two interests diverged. The command of the Boulware approach was clear: employees and the general public must be barraged with communications that emphasized the generosity of the offer, and restated the firmness of GE's position. A genuine desire to reach a mutual accommodation might, on the other hand, have called for GE to await Union comments before taking a stand from which it would be difficult to retreat. GE hardly hesitated. It released the offer the next day, without waiting for Union comments on specific portions.[14]

The most telling effect of GE's marketing campaign was not on the Union, but on GE itself. Having told its employees that it had made a "firm, fair offer," that there was "nothing more to come," and that it would not change its position in the face of "threats" or a strike, GE had in effect rested all on the expectation that it could institute its offer without significant modification. Properly viewed, then, its communications approach determined its take-it-or-leave-it bargaining strategy. Each was the natural complement of the other; if either were substantially changed, the other would in all probability have to be modified as well. It is only in this context that GE's incomprehensible insistence on a January 1 starting date for the pension benefits, and the "explanations" that followed it, can be understood.

All this was brought into the open during the September 28 meeting. Virtually on the eve of the strike, Union negotiators were searching for a way to save face by reconstituting their SUB proposal within the outlines of the Company's costs. Far from being frivolous as the dissent seems to suggest, such last minute attempts at compromise are the

---

tainly, in response to a prior union inquiry of September 20) decided that GE employees who paid full premiums on both GE and other contributory group plans should not be required to forego their GE benefits. Those whose spouse, for example, received family coverage under a plan paid in part by another employer, would still receive nothing under the GE plan. With all due respect, the characterization "minor" still seems appropriate.

14. GE claims that the IUE first released the Company offer to its members. Examining the basis for this claim, we find it insubstantial. First, the IUE releases occurred only after GE announced that it would not delay publication of its offer, but would give it to the media the next morning, August 31. Second, both the instances relied upon involved incidental mimeographed flyers, one of which stated that it was not to be released until after 4 P.M. August 30. When viewed against the Company's coordinated, massive campaign, both instances appear unplanned and inconsequential. For example, a typical employee at some of the larger plants received over 100 written Company communications during September and October. On many days he was subjected to two, and sometimes three or four GE messages, not including oral discussions and meetings with Company supervisors.

stuff of which lasting accommodations and productive labor-management relations are made. The substance of the Company's response to this effort was well put by their chief negotiator, Philip Moore:

> "After all our month of bargaining and after telling the employees before they went to vote that this is it, we would look ridiculous to change it at this late date; and secondly the answer is no."

The Company, having created a view of the bargaining process that admitted of no compromise, was trapped by its own creation.[15] It could no longer seek peace without total victory, for it had by its own words and actions branded any compromise a defeat.

GE urges that section 8(c), 29 U.S.C. § 158(c) (1964), prohibits the Board from considering its publicity efforts in passing on the legality of its bargaining conduct. The section reads:

> "(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

GE would have us read that section as a bar to the Board's use of any communications, in any manner, unless the communication itself contained a threat or a promise of benefit. The legislative

history, past decisions, and the logic of the statutory framework, however, indicate a contrary conclusion.

The bald prohibition of section 8(c) invited comment when it was enacted, as well as later. Senator Taft replied to some of the criticism of the bill that bears his name:

> "It should be noted that this subsection is limited to 'views, arguments, or opinions' and does not cover instructions, directions, or other statements that would ordinarily be deemed relevant and admissible in courts of law." I Legislative History of the LMRA 1947, at 1541.

The key word is "relevant." The evil at which the section was aimed was the alleged practice of the Board in inferring the existence of an unfair labor practice from a totally unrelated speech or opinion delivered by an employer. Senator Taft later indicated, for example, in the context of a section 8(a) (3) discriminatory firing, that prior statements of the employer would have to be shown to "tie in" with the specific unfair labor practice. I Legislative History of the LMRA 1947, at 1545. Later references to the section described the barred statements as those which were "severable or unrelated," and "irrelevant or immaterial." II Legislative History of the LMRA 1947, at 429 (Senate Report), 549 (House Conference Report). The objective of 8(c) then, was to impose a rule of relevancy on the Board in evaluating the legality of statements by parties to a labor dispute.[16] Its pur-

---

15. Similarly, GE's insistence on putting its pension and wage benefit proposals into effect before the IUE agreed to them, or the old contract was at an end (contrary to prior practice) dovetailed with its communications program, since its policy of uniformity meant that it intended firmly to see that union members would receive the same and no more. This is but one more example of how a policy such as uniformity, innocent in and of itself, can in context become a vital part of an illegal overall pattern of conduct.

16. See Linn v. United Plant Guard Workers, 383 U.S. 53, 62, 86 S.Ct. 657, 663, n. 5 (1966):

> "The wording of the statute indicates, however, that § 8(c) was not designed to serve this interest by immunizing all statements made in the course of a labor controversy.
>
> \*　\*　\*　\*　\*　\*
>
> It is more likely that Congress adopted this section for a narrower purpose, i. e., to prevent the Board from attributing anti-union motive [sic] to an employer on the basis of his past statements." [Citations omitted.]

Congress may also have been concerned with the Board's "captive audience" doctrine, by which employer speeches during working time were found to be unfair

pose was hardly to eliminate all communications from the Board's purview, for to do so would be to emasculate a statute whose structure depends heavily on evaluation of motive and intent. See e. g., §§ 8(a)(1), 8(a)(3), 8(a)(5).

The cases have largely supported this view. The Board may rely on communications to establish discriminatory treatment in violation of sections 8(a)(3) and 8(a)(1). See NLRB v. Lipman Bros., Inc., 355 F.2d 15 (1st Cir. 1966); Hendrix Mfg. Co. v. NLRB, 321 F.2d 100 (5th Cir. 1963). Employer communications were used to evaluate the presence of a state of mind inconsistent with the obligation to bargain in good faith in NLRB v. Fitzgerald Mills Corp., 313 F.2d 260, 268 (2d Cir.), cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963); and NLRB v. Herman Sausage Co., 275 F.2d 229 (5th Cir. 1960).

While it is clear that the Board is not to control the substantive terms of a collective bargaining contract, nonetheless the parties must do more than meet.[17] Our brother Friendly makes much of the point that General Electric did bargain and reach an "agreement" with the Union. He says that prior 8(a)(5) cases demanded nothing less than a showing of no such desire to reach an agreement, and opines that without such a "definite standard" an 8(a)(5) violation may not be made out. Some cases have indeed spoken of the evil of a "desire not to reach an agreement with the Union" as crucial. While the dissenting opinion cites NLRB v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1st Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953), for that authority, we hasten to note that Judge Magruder was careful in his opinion not

to be misled, as our dissenting brother appears to be, by words that seem on the surface quite simple but in practice require a highly pragmatic and individualized interpretation. Judge Magruder did not suggest that "desire not to reach an agreement" could be found, as the dissent suggests, by a clearly delineated series of steps, $X_1$, $X_2$, $X_3$, taken to "point Y, plus a number of additional items, $Z_1$, $Z_2$, $Z_3$." Far from being a devotee of the new math, he would have agreed with Learned Hand that numbers, even more than words, "are utterly inadequate to deal with the fantastically multiform occasions which come up in human life." In the case before Judge Magruder, Reed & Prince submitted a woefully inadequate and demeaning "offer" of a contract. Presumably, the Union could have seen no alternative but to accept it, and had it done so, our brother Friendly would have held that the Company bargained with a "desire to reach an agreement," and thus had not violated the proscriptions of § 8(a)(5). Judge Magruder, on the other hand, said that the "employer is obliged to make *some* reasonable effort in *some* direction to compose his differences with the union, if § 8(a)(5) is to be read as imposing any substantial obligation at all." 205 F.2d at 135. His point, of course, was that "desire to reach agreement" may mean different things to different people, but in the context of a meaningful and purposeful reading of section 8(a)(5) it must mean more than a willingness to sign a piece of paper. The statute does not say that any "agreement" reached will validate whatever tactics have been employed to exact it. To imply such a Congressional purpose would be to encourage parties to make their vi-

labor practices. See Casenote, 57 Mich. L.Rev. 615 (1959). That problem, of course, is not present here, and supports our view of the restrictive scope of section 8(c).

17. Thus we find no ground for disagreement with the portion of Judge Burger's dissent in United Steelworkers of America v. NLRB, 129 U.S.App.D.C. 80, 390 F.2d

846 (1967), cert. denied, Roanoke Iron & Bridge Works v. NLRB, 391 U.S. 904, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968), cited by our brother Friendly. Indeed, we are somewhat perplexed at the unusually heavy reliance our dissenting brother places on a dissenting opinion. The author of that opinion is now the Chief Justice of the United States.

olation so blatant that it would be impossible for the other side to continue to exist without signing. Instead the statute clearly contemplates that to the end of encouraging productive bargaining, the parties must make "a serious attempt to resolve differences and reach a common ground," NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 486, 487, 488, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960), an effort inconsistent with a "predetermined resolve not to budge from an initial position." NLRB v. Truitt Mfg. Co., 351 U.S. 149, 154–155, 76 S.Ct. 753, 757, 100 L.Ed. 1027 (1956) (Frankfurter, J., concurring). These are not simple tests; they will not be resolved by formular incantations. Sadly, neither will they be so precise that one will always know the exact limits of what is allowed, and what forbidden—but this is a problem hardly unknown in the law or to judges. The difficulty here, however, arises out of the herculean task of legislating a state of mind. Congress has ordered the Board—and this court—to effectuate its policy of encouraging good faith bargaining, and not to avoid it because the mandate is difficult to apply. The Board has done just that. And, on the basis of substantial evidence we agree. A pattern of conduct by which one party makes it virtually impossible for him to respond to the other—knowing that he is doing so deliberately—should be condemned by the same rationale that prohibits "going through the motions" with a "predetermined resolve not to budge from an initial position." See NLRB v. Truitt Mfg. Co. supra (concurring opinion).

The employer who leaves for a long vacation, giving his negotiator instructions not to budge is no different from the employer who remains on the scene and commands the same behavior daily. Cf. Cox, The Duty to Bargain in Good Faith, 71 Harv.L.Rev. 1401, 1418 & n. 61 (1958). We are assumed to intend the natural and probable consequences of our acts.

The Company and the dissenting opinion seem to take the novel position that the holding in *Insurance Agents'*—that the Board might not forbid a partial strike during bargaining—ousts the Board's control over bargaining tactics. But in NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the Court held that at least one tactic—instituting unilateral changes during bargaining—was forbidden, for it put a bargainable topic outside the reach of the bargaining process. GE has done no less; it has, if anything, done more. By its communications and bargaining strategy it in effect painted itself into a corner on *all* bargainable matters.

In order to avoid any misunderstanding of our holding, some additional discussion is in order. We do not today hold that an employer may not communicate with his employees during negotiations. Nor are we deciding that the "best offer first" bargaining technique is forbidden. Moreover, we do not require an employer to engage in "auction bargaining," or, as the dissent seems to suggest, compel him to make concessions, "minor" or otherwise. See p. 44, *supra*.

Our dissenting brother's peroration conjures up the dark spectre that we have taken a "portentous step" which " 'contains seeds of danger for unions' " as well as employers. This picturesque characterization is unfortunate for it is a scare-phrase which tends to distract from the facts in this case. It paints over with a broad stroke the care we have taken to spell out the bounds of our opinion. We hold that an employer may not so combine "take-it-or-leave-it" bargaining methods with a widely publicized stance of unbending firmness that he is himself unable to alter a position once taken. It is this specific conduct that GE must avoid in order to comply with the Board's order, and not a carbon copy of every underlying event relied upon by the Board to support its findings. Such conduct, we find, constitutes a refusal to bargain "in fact." NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107 (1962). It also constitutes, as the facts of this action demonstrate, an absence

of subjective good faith, for it implies that the Company can deliberately bargain and communicate as though the Union did not exist, in clear derogation of the Union's status as exclusive representative of its members under section 9(a). See NLRB v. Herman Sausage Co., 275 F.2d 229, 234 (5th Cir. 1960).

 We have considered the Company's other arguments, including those in favor of disqualifying Board Member Fanning, and against reinstating the replaced workers, but we find them unavailing.[18] The petition for review is denied, and the petition for enforcement of the Board's order is granted.[19]

WATERMAN, Circuit Judge (concurring).

I fully concur with my brother Kaufman. Without differing from the majority opinion in any way and without reiterating its arguments, I would challenge my brother Friendly's dissenting assertion that the standard set forth by Judge Kaufman for determining overall bad faith is vague or difficult to apply. A company may make a firm, fair offer to the union and may stand by that offer, but the company should not be permitted

---

18. We do not think that Board Member Fanning's use of the term "boulwareism" was indicative of bias; the term is more description that invective. See note 1 *supra.*

Since the Board might reasonably have found that the unfair labor practice was a cause of the strike, reinstatement of replaced strikers was proper. NLRB v. Fitzgerald Mills Corp., 313 F.2d 260, 269 (2d Cir. 1963), cert. denied 375 U.S. 834, 84 S.Ct. 47 (1963).

19. The dissent joins GE and the intervenor Union in attacking the Board's order as wanting in specificity. While a more detailed order would be preferable, we are aware that:

"Once good faith is found wanting, the scope of relief to be given by the Board is largely a question of administrative discretion." NLRB v. Truitt Mfg. Co., 351 U.S. 149, 156, 76 S.Ct. 753, 757 (1956) (Frankfurter, J., concurring). See also NLRB v. Celotex Corp., 364 F.2d 552, 554 (5th Cir. 1966), cert. denied 385 U.S. 987, 87 S.Ct. 601, 17 L.Ed. 2d 450 (1966). Courts do not rubber stamp requests by the NLRB for a contempt citation pursuant to a general bargaining order. See, e. g., NLRB v. Corsicana Cotton Mills, 179 F.2d 234 (5th Cir. 1950). It is reasonable to assume that before a court would undertake to cite either a union or an employer for contempt, it would afford the party every opportunity to show that it was not contumacious, and had made a good faith effort to comply with the terms of the bargaining order. See NLRB v. Corsicana, *supra;* NLRB v. Athens Mfg. Co. 163 F.2d 255 (5th Cir. 1947).

We are also mindful of the excessively lengthy and complicated history of this case, and are unwilling to add needless pages and innumerable days to it by remanding to the NLRB for a more specific order, or by starting the interminable process anew. To illustrate, the action has been before the Board and the courts for nine years; one procedural matter has been to the Supreme Court already. The negotiating minutes occupy 1500 pages; the transcript (taken on 79 separate dates) before the Trial Examiner another 10,000. The Trial Examiner's Intermediate Report covers some 240 pages in the appendix to this action; GE took 527 exceptions to that report before the full Board. The NLRB's opinion was mercifully short, but briefs before this court ran to almost 500 pages. We need not dwell on the exhibits, which detailed (in detail) a substantial portion of Union and Company publicity efforts.

The dissent (p. 19), undoubtedly relying on newspaper reports, suggests that it is "scarcely possible that the Company's actions are so nearly parallel to those of 1960. * * *" For what it is worth, we quote the last three paragraphs of a recent news report:

A company spokesman objected to a description of the company's offer on Tuesday as its "first" because, he said, this implied that there would be a second or third.

He said that the company had put its "whole offer" on the table and that nothing had been held back for later concessions.

Asked if he meant that the offer was the company's final one, he replied, "Not necessarily, but it is all that should be there at this time." New York Times, Oct. 9, 1969.

to advertise to its employees that it believes in the firmness of its offers for the sake of firmness.

We recognize that a company is entitled to insist on the terms of its original offer if it believes that the union can be made to accept that offer. That GE refused to yield to union demands without giving reasons based upon cost, maintained a "stiff and unbending" posture, used a unilateral letter of intent when final agreement was reached, failed to make significant concessions, and publicized its offer without waiting for union suggestions do not indicate anything except that GE made and stood by what it conceived to be a fair, firm offer.

What makes these practices unfair is GE's "widely publicized stance of unbending firmness," that is, GE's communications to its employees that firmness was one of the company's independent policies. Two distinct evils derive from such publicity. First, publicity regarding firmness tends to make the company seal itself into its original position in such a way that, even if it wished to change that position at a later date, its pride and reputation for truthfulness are so at stake that it cannot do so. Second, publicity regarding firmness fixes in the minds of employees the idea that the company has set itself up as their representative and therefore that the union is superfluous. Doubtless these evils exist to some extent whenever a company makes, and stands by, a firm fair offer even when there is no company publicity of the kind here involved. However, it seems clear that publicity tends to amplify these undesirable tendencies to the point that, in a case such as this one, the amplification can well be construed to have been activated by a company motive not to bargain in good faith.

On the other side of the ledger there is very little positive good which can derive from company publicity which indicates that a company believes in firmness for firmness' sake. The free speech benefits of publicity in labor negotiations lie in the fact that informed employees will better know whether to vote for or against a strike and how to evaluate the union's performance on their behalf. These benefits can all be reaped by a company which advertises the terms of an offer and its belief that these terms are fair, without also stating that as a matter of policy it can never be persuaded to change the advertised terms. Such advertisement could only tend to convince employees that because firmness is a company policy it is also a company policy to ignore the union. A company, of course, can advertise its belief that its offer is fair, and that, at the particular time, it sees no reason to change its offer even to forestall a strike. This kind of statement is different from advertising that it is company policy never to change any offer in response to union pressure.

This view does not differ from that of the NLRB, nor does it indicate that the Board reached the right result for the wrong reasons. The trial examiner, whose opinion the Board adopted, specifically condemned GE's declarations that "a union could obtain no added benefits that it would not otherwise grant." 150 N.L.R.B. at 279. Because of this dominant wrong, we agree with the trial examiner that other aspects of the communications program also evidenced bad faith on the facts of this case although not as a matter of law. 150 N.L.R.B. at 274. It does no violence to the doctrine of SEC v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943) to point out which of those factors correctly relied upon by an agency in the case at hand will also be instrumental in determining decisions in the future.

FRIENDLY, Circuit Judge (concurring and dissenting).

I agree with my brothers that by refusing to furnish cost information and by bargaining with locals during the strike, GE violated § 8(a) (5) of the National Labor Relations Act. I do not believe it also violated the Act by submitting a contributory personal accident insurance plan to the Union and de-

clining to bargain about it until the time for reopening of negotiations. I think also, along lines similar to Member Jenkins' concurring opinion, that other specific conduct of the Company, such as that in regard to the effective date of the pension plan, pp. 12–13, and the form of the strike settlement agreement, p. 17, could properly have been condemned and an appropriate order framed. However, the majority of the Board was at pains to emphasize that its finding of overall bad faith was not based upon identifiable acts or failures to act that GE could avoid in the future but rather

> upon our review of (1) the Respondent's entire course of conduct, (2) its failure to furnish relevant information, (3) its attempts to deal separately with locals and to bypass the national bargaining representative, (4) the manner of its presentation of the accident insurance proposal, (5) the disparagement of the Union as bargaining representative by the communication program, (6) its conduct of the negotiations themselves, and (7) its attitude or approach as revealed by all these factors.[1]

Such attempts to restrict communications (item 5) and lay down standards with respect to bargaining techniques, attitudes and approaches (items (6) and (7)), bring the Board into collision with § 8(c) and (d) and the important policies they embody. It is easy to understand that anyone reviewing this enormous record would emerge with a good deal of sympathy for the situation of the Union and distaste for the tactics of the employer; no one likes to see a person who regards himself as in a strong position pushing it unduly, even though the fairness of GE's offer is not challenged. But the Act does not empower the Board to translate such feelings into a finding of an unfair labor practice, and judicial sanction of such efforts to intrude into areas which Congress left to the parties may in the long run be quite as detrimental to unions as to employers. See N. L. R. B. v. Insurance Agents' Int'l Union, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960).

## I.

Before I elaborate my doubts with respect to the determination of overall bad faith, it will be desirable to outline the basis for my disagreement with the conclusion that GE's proffer of a personal accident insurance plan on a contributory basis, before the beginning of the contractual period for bargaining, constituted an independent violation of § 8 (a) (5). While the Board's order contains no specific reference to this, at least three members relied heavily upon it for their conclusion of overall lack of good faith (see item (4)), as does the lead opinion here. If this conclusion is wrong, as I think it to be, such an important element is removed from the "totality of the circumstances" on which the Board relied that, on this ground alone, we could not properly enforce the order as to overall bad faith.

Discussion of the issue must begin by clearly delineating what it is not. No one is suggesting, as the majority intimates, p. 747, that GE could unilaterally change the terms of an agreed insurance plan to the detriment of its workers. Still less is anyone suggesting, see p. 748, that GE could confer a benefit only on non-union members. It is not even claimed that the Company could make a benefit effective for employees represented by a union without advising the union and obtaining the latter's consent. The narrow issue is whether an employer is prohibited from even putting such a proposal to a union at a time when bargaining is not required under the contract unless he is willing to bargain about it then and there.

Section 8(a) (5), as elaborated in § 8(d), requires the employer and the representatives of the employees "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of em-

---

1. Numbers have been inserted for convenient reference.

ployment, or the negotiation of an agreement, or any question arising thereunder * * *." When an agreement has been reached, its provisions define what constitute "reasonable times" for bargaining. Here GE and the Union provided in the 1955 Pension and Insurance Agreement in the most explicit terms that "each of the parties voluntarily and unqualifiedly hereby waives any and all rights to require that the other party or parties hereto bargain collectively during the terms of this Agreement, with respect to any such subjects or matters whether or not such matters are covered by this Agreement." See n. 4 to the majority opinion. Unless language in a labor agreement is to be denied its plain meaning, this protects GE's conduct here. I wholly fail to perceive how the Company's further insistence on a specific renunciation by the Union of strikes, etc., to enforce modifications of insurance and pension benefits outside of a bargaining period in any way qualifies the language I have quoted.

N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the decision relied upon to support the conclusion that GE's proffer of a contributory personal accident insurance plan violated § 8(a) (5), is more striking in its differences than in its resemblances. There, *during a period of bargaining*, the employer *made* three unilateral changes with respect to terms and conditions of employment; the Court's decision, scarcely a surprising one, was that this constituted "a refusal to negotiate *in fact*." 369 U.S. at 743, 82 S.Ct. at 1111. Here GE merely *submitted a proposal* and did this *at a time when it had no duty to bargain at all.*

While I can understand that an employer's refusal to bargain about a benefit he has voluntarily proffered during the term of an agreement may not be pleasing to a union, that does not violate the Act, at least when the contract expressly permits it. The majority attempts to escalate the problems by suggesting that the course here fol-

lowed would create "divisive tendencies within the Union," and even enable the "Company to pick the Union apart piece by piece." P. 747. These comments, unsupported by the record, are singularly inappropriate as applied to the offer of a contributory personal accident insurance plan which employees with hazardous occupations were free to accept and those with routine duties to decline, which could hardly affect the Union's position on the next negotiating round since it cost GE nothing other than the costs of administration, where the Company refused to make capital of the Union's rejection, and when the Union considered the issue so unimportant that it did not even bring the matter up for negotiations during the formal bargaining sessions. One could also argue, in opposition to the majority's position, that the Board's determination offends the policy, although not indeed the letter, of the lengthy proviso to § 8(d), since requiring an employer to bargain in a situation such as that presented here, with the corollary that the union may support its bargaining demands with strike threats or strikes, see NLRB v. Lion Oil Co., 352 U.S. 282, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957), undermines the broad purpose of enabling such modifications as are made during the term of an agreement to be made peaceably. However, it is enough for me that nothing in the Act or the court decisions under it can fairly be read to prohibit an employer, during the period of a contract when bargaining would not otherwise be required, from asking a union whether it will consent to his giving a benefit to the employees whom it represents. Cf. N. L. R. B. v. Honolulu Star-Bulletin, Inc., 372 F.2d 691 (9 Cir. 1967).

## II.

The objective of § 8(a) (5), as stated by the Senate Committee on Education and Labor, S.Rep. No. 573, 74th Cong. 1st Sess. 12 (1935), was to impose a duty on employers "to recognize such representatives as they have been designated

* * * and to negotiate with them in a *bona fide* effort to arrive at a collective bargaining agreement * * * " In 1947 the fear was expressed in Congress that the N. L. R. B. "has gone very far, in the guise of determining whether or not employers had bargained in good faith, in setting itself up as the judge of what concessions an employer must make and of the proposals and counterproposals that he may or may not make." H. R.Rep. No. 245, 80th Cong. 1st Sess. 19 (1947). As a result Congress enacted § 8(d), expressly providing that the obligation to bargain "does not compel either party to agree to a proposal or require the making of a concession." See N. L. R. B. v. American Nat'l Ins. Co., 343 U.S. 395, 402–404, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). At the same time, in the light of other actions of the Board, Congress added § 8(c), declaring in unequivocal terms that:

> "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

The great bulk of the Board's salutary decisions under § 8(a) (5) have been in areas far removed from any possibility of conflict with § 8(c) or (d). Perhaps the most important single group consists of cases where the employer has refused to deal with a union at all or, as in GE's dealing with locals, has negotiated over its head; in such instances, although the Board normally issues a broad order to bargain in good faith, no one supposes that the order dictates just how the bargaining shall be conducted. Beyond that the Board, with the approval of the Supreme Court, has usefully identified a considerable number of practices constituting *per se* violations.

These include refusal to sign a written contract embodying an agreement, H. J. Heinz Co. v. N. L. R. B., 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1941), a practice now specifically prohibited by § 8(d); offering employees, during the course of negotiation, more than was offered through the union, N. L. R. B. v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320 (1949); making unilateral changes while bargaining is in process, N. L. R. B. v. Katz, *supra,* 369 U.S. 736, 82 S.Ct. 1107; refusing to furnish available information needed by the union to evaluate a bargaining position, N. L. R. B. v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); and insisting as a condition of agreement upon a subject outside the area of mandatory collective bargaining, N. L. R. B. v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

The danger of collision with § 8(c) or (d) arises only when the Board makes a finding of violation although the parties have sat down with each other and have not engaged in any proscribed tactic. Still I have no difficulty with the Board's making a finding of bad faith based on an entire course of conduct so long as the standard of bad faith is, in Judge Magruder's well-known phrase, a "desire not to reach an agreement with the Union." N. L. R. B. v. Reed & Prince Mfg. Co., 205 F.2d 131, 134 (1 Cir.), cert. denied, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953). In such instances, the difficulties inevitable in an examination of the "totality of the circumstances" and an order based upon them are outweighed by the definiteness of the standard, the consequent feasibility of compliance, and the necessity for such an order if the employer's duty to recognize the union is to be carried out in substance as well as in form. See, e. g., N. L. R. B. v. Montgomery Ward & Co., 133 F.2d 676, 146 A.L.R. 1045 (9th Cir. 1943).[1a] However, as Professor Cox re-

---

[1a] The lead opinion is in error in its speculation concerning what I "would have held" had I sat in *Reed & Prince* but an agreement had been reached on the employer's terms. There is simply no analogy between Reed & Prince's conduct,

768

marked in a notable article which has been cited with approval by the Supreme Court, N. L. R. B. v. Insurance Agents' Union, *supra,* 361 U.S. at 489–490, 80 S.Ct. 419, and has not suffered from the lapse of a decade, it is "doubtful whether much is gained by retrospective review of the negotiations when the parties have actually bargained together." The Duty to Bargain in Good Faith, 71 Harv.L. Rev. 1401, 1439 (1958). Here the General Counsel conceded that GE entertained no such prohibited desire and, despite the majority's innuendoes concerning antiunion animus, the Trial Examiner rightly observed that no claim was "made in this case that the respondent was seeking to rid itself of the Union," with which it had been dealing for many years and expected to deal for many more.

The only prior court decision that has approved a finding of overall bad faith when there was a desire to reach an agreement is United Steelworkers of America v. N. L. R. B., 390 F.2d 846 (D.C. Cir. 1967), cert. denied, Roanoke, Iron & Bridge Works v. N. L. R. B., 391 U.S. 904, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968), a decision rendered over the dissent of Chief Justice (then Judge) Burger. However one may regard that decision, the Board's case was far stronger than here. The employer had refused to budge from an adamant position against a voluntary check-off although it had granted this to a more favored union three years before, had propagandized the employees that a previous similar refusal on its part had destroyed a union, and had advanced no business reasons whatever, "all in a context of vigorous anti-union animus." 390 F.2d at 852. There was thus considerable basis for inferring that the employer was seeking eventually to rid itself of the union despite its desire to reach an agreement

at the moment. Yet even in that context Judge Burger referred to the Board's postulating "the novel and internally inconsistent proposition that a bargainer can be found to have refused to bargain in good faith even while at the same time it is found to have engaged in bargaining in a good faith effort to reach an agreement and has actually reached a final and binding contract," 390 F.2d at 853.[2]

Although both the Board and the majority here have been quite explicit in describing what they are not deciding, they are far less informative with respect to what they are. The closest the lead opinion comes to this is its statement (p. 762) that its basis for upholding the order with respect to overall bad faith is "that an employer may not so combine 'take-it-or-leave-it' bargaining methods with a widely publicized stance of unbending firmness that he is himself unable to alter a position once taken." My brother Waterman, though avowedly concurring fully, takes what seems to me a quite different view, namely, that GE's "bargaining methods" were entirely lawful and only its allegedly publicization of a "stance of unbending firmness" was unfair.

While the lead opinion makes much use of the "take-it-or-leave-it" phrase, it never defines this. I should suppose it meant a resolve to adhere to a position without even listening to and considering the views of the other side. To go further and say that a party, whether employer or union, who, after listening to and considering such proposals, violates § 8(a) (5) if he rejects them because of confidence in his own bargaining power, would ignore the explicit command of § 8(d)—as Judge Waterman recognizes. Although the taking of such a hard position may be unattractive, the attitude is one which the law allows an employer or a union to take, despite the dictum in

see 205 F.2d at 138–139, and GE's response to the Union by an offer of a 3% increase for the first two years and a 4% increase for the third and numerous additional benefits, plus the further changes referred to below.

2. I thus cannot understand how the majority can agree with Judge Burger's dissent, n. 17, and still reach the result it does.

Justice Frankfurter's concurring opinion in N. L. R. B. v. Truitt Mfg. Co., *supra,* 351 U.S. at 154, 76 S.Ct. 753.

It surely cannot be, for example, that a union intent on imposing area standards violates § 8(b) (3 if it refuses to heed the well-documented presentation of an employer who insists that acceptance of them will drive him out of business. Neither can it be that a union violates § 8(b) (3) if it insists on its demands because it knows the employer simply cannot stand a strike.[3] It must be equally true that an employer is not to be condemned for "take-it-or-leave-it" bargaining when, after discussing the union's proposals and supporting arguments, he formulates what he considers a sufficiently attractive offer and refuses to alter it unless convinced an alteration is "right." Hence the Board correctly declined to affix the "take-it-or-leave-it" label which my brother Kaufman uses.

Once we rid ourselves of the prejudice inevitably engendered by this catchphrase, we reach the argument that a party violates § 8(a) (5) if he gets himself into a situation where he is "unable to alter a position once taken," even though he would otherwise be willing to do so.

While this sounds fair enough, as does the Board's somewhat similar remark about the continuing duty to give "unfettered consideration," it would seemingly outlaw practices that no one has considered illegal up to this time. A union that has won a favorable contract from one employer and has broadcast that it will take no less from others seems to me to be quite as "unable to alter a position once taken" as GE was here, yet I should not have supposed this violated the Act. So also with an employer who has negotiated a contract with one union and has proclaimed that he will do no better for others. To say that taking such positions violates § 8(b) (3) or 8(a) (5) is steering a collision course with § 8(d).

Moreover, I find no substantial evidence that GE got itself into the predicament the majority depicts. The best evidence to the contrary consists of the changes the Company in fact made. In response to Union objections to the offer as initially presented informally, GE modified it to include a wage reopener on April 1, 1962, as an alternative to the automatic 4% increase it had proposed. On September 9, *after* it had publicized its offer and in response to feelers from some Union negotiators, it advanced the option of substituting an additional holiday and a fourth week of vacation for employees with 25 years of service in exchange for 1% of this 4%.[4] Twelve days later it agreed to reduce the costs of the Union's representatives' pension plan from 6% of the first $4800 and 15% thereafter to 4% and 10%—which the Union's chief negotiator called "an excellent proposition." Even though, as the majority states, the reduction was responsive to new actuarial calculations, this shows that GE was not using a mere form of words when it said it would make a change if convinced one was "right." Finally, GE yielded on a clause, Exclusion K, in its insurance plan [5] which the chairman of the Union negotiating committee had characterized as having "caused more dissatisfaction

---

3. Cutler v. N.L.R.B., 395 F.2d 287 (2 Cir. 1968), is another illustration of the permissibility of union obduracy, Although the employer's failure to press his demands made it possible for this court to uphold the decision in favor of the union without reaching the issue of overall good faith, it would require some naiveté to suppose that any efforts by the employer in that case to get the musicians' union to alter its wage scale would have borne the slightest fruit.

4. The Union was offered the choice of exercising this option on a plant-by-plant basis so that plants where employees with longer service predominated could accept the vacation option and others could retain the added pay.

5. This prevented recovery of benefits for an employee or his dependents if they were covered by other group insurance.

among the people than anything else." The Union's insurance specialist called this "a good improvement."

The Union's appraisals of the value of these concessions at the time is more impressive than the depreciation of them nine years after the event. Moreover, in appraising such concessions it is important to remember Judge Burger's caution that, although it may sometimes be necessary to consider "the reasonableness of parties' positions on particular issues to determine whether, under all the circumstances of the negotiation, a particular bargaining position was adopted for the purpose of frustrating negotiation generally and thus preventing an agreement," "the courts have been vigilant lest the examination of parties' positions to test good faith become a process of judging, directly or indirectly, the substantive terms of their proposals." United States Steelworkers of America v. N. L. R. B., *supra*, 390 F.2d at 853 (dissenting opinion). By characterizing some of the changes as "of quite minor significance," the lead opinion does precisely that.

I find nothing on the other side substantial enough to outweigh this evidence that GE remained able to adopt changes it thought to be "right." Much is made of the September 28 exchange between Jandreau, Moore, and Hilbert over a Union proposal that the Income Extension Aid funds and part of the money for a wage increase provided in the Company offer be used instead for Supplementary Unemployment Benefits (SUB). The lead opinion, following the Trial Examiner, misinterprets Hilbert's remarks. Hilbert's objection to the Union proposal

was that it came at so late a date that the Union could not seriously expect the Company to act upon it. He said that there were only three reasons why the Company might change its offer at such a time; if they had deliberately held something back for horse-trading; if they had made an error in deciding what was "right"; or if they were so afraid of a strike that they would give in even though they continued to believe that their offer was "right." *If* the first or last reasons had applied, he said, GE would indeed look foolish in the eyes of its employees and the public at large, but they did not apply.[6]

### III.

An essential element to the Board's conclusion of GE's offending was the Company's publicity campaign. "The disparagement of the Union as bargaining representative" is item (5) in the Board's bill of particulars. The Board elaborated this by saying it is unlawful "for an employer to mount a campaign, as Respondent did, both before and during negotiations, for the purpose of disparaging and discrediting the statutory representative in the eyes of its employees, to exert pressure on the representative to submit to the will of the employer, and to create the impression that the employer rather than the union is the true protector of the employees' interests."

I find no warrant for such a holding in the language of the statute, its legislative history or decisions construing it. GE's communications fit snugly under the phrase "views, argument, or opinion" in § 8(c). The very archetypes of what

---

6. More generally, Hilbert's and Moore's remarks must be set in context before they can be properly understood. SUB had first been proposed by the Union and rejected by the Company in the 1958 negotiations. It was again raised and again rejected in the early 1960 meetings on employment security. The Company's opposition was based largely on principle rather than cost, so that Jandreau's protests that he was trying to work within the cost framework of the Company were beside the point in its view. Considered in this context, and with the strike looming four days off, Hilbert's objection that the Union proposal came too late does not seem ill taken. But even here, after Moore had made the statement quoted in the majority opinion and Jandreau had said "There is no sense in being here," Moore replied "Unless there is anything you want us to hear. If you have something new or persuasive, persuade us."

Congress had in mind were communications by an employer to his workers designed to influence their decisions contrary to union views, and communications by unions to workers designed to influence their decisions contrary to employer views. The statute draws no distinctions between communications by an employer in an effort to head off organization [7] and communications after organization intended to show that he is doing right by his employees and will do no more under the threat of a strike. Congress had enough faith in the common sense of the American working man to believe he did not need—or want—to be shielded by a government agency from hearing whatever arguments employers or unions desired to make to him. Freedom of choice by employees after hearing all relevant arguments is the cornerstone of the National Labor Relations Act.

As for the legislative history of § 8(c), the full text of Senator Taft's remarks in this context was:

> The purpose of this language is to make it clear that the Board is not to use any utterances containing [no] threats or promises of benefits as either an unfair practice standing alone or as making some act which would otherwise not be an unfair labor practice, an unfair labor practice. It should be noted that this subsection is limited to "views, argument, or opinions" and does not cover instructions, directions, or other statements which might be deemed admissions under ordinary rules of evidence. In other words, this section does not make incompetent, evidence which would ordinarily be deemed relevant and admissible in courts of law. 2 Legislative History of the LMRA, 1947, at 1541 (1948).

It is plain that GE's communications came under the protection of the statute, and not the exception which Senator Taft described. The word "relevant" in Senator Taft's speech cannot be blown up to

such a degree as to render the amendment largely nugatory. The case is in sharp contrast with NLRB v. Fitzgerald Mills Corp., 313 F.2d 260, 268 (2 Cir.), cert. denied, 375 U.S. 834, 84 S.Ct. 47, 11 L.Ed.2d 64 (1963), cited by the Board and the majority, where the company's general manager said that he would "die and go to hell before he would sign a contract" and told his employees to "get those union agitating sons of bitches out of Fitzgerald." NLRB v. Herman Sausage Co., 275 F.2d 229 (5th Cir. 1960), the only other case cited by the Board in support of this part of its opinion, is equally inapposite.

The Trial Examiner's criticisms of GE's communications as being one-sided and "massive," and as portraying the union negotiators in an unfavorable light, which were endorsed by the Board and are reflected in the lead opinion, see fn. 14, ignore the whole thrust of § 8(c). Although Mr. Justice Black was in dissent in Linn v. United Plant Guard Workers, 383 U.S. 53, 67–68, 86 S.Ct. 657, 665, 15 L.Ed.2d 582 (1966), there was no disagreement with his statement:

> When Congress passed the National Labor Relations Act, it must have known, as almost all people do, that in labor disputes both sides are masters of the arts of vilification, invective and exaggeration.

It is for unions and employers, not for a government agency, to determine how "massive" their communications shall be.

The Examiner coined a phrase, echoed both by the Board and in the lead opinion, see p. 759, namely, that GE's communications program was an attempt "to deal with the Union through the employees rather than with the employees through the Union." Somewhat parallel to this is the opinion's statement that the Company "deliberately bargain[ed] and communicate[d] as though the Union did not exist, in clear derogation of the Union's status as exclusive representative of its members under section 9(a)," p. 763.

---

7. See generally Bok, The Regulation of Campaign Tactics in Representation Elec- tions Under the National Labor Relations Act, 78 Harv.L.Rev. 38, 66–92 (1964).

Picturesque characterizations of this sort, at such sharp variance with the record, scarcely aid the quest for a right result. Members of Congress would probably be surprised to learn that being "exclusive representatives" means that interested parties may not go to constituents in an endeavor to influence the representatives to depart from positions they have taken. There can be nothing wrong in an employer's urging employees to communicate with their representatives simply because the communication is one the representatives do not want to hear. I thus find it impossible to accept the proposition that, by exercising its § 8(c) right to persuade the employees and by encouraging them to exercise their right to persuade their representatives, GE was somehow "ignoring the legitimacy and relevance of the Union's position as statutory representative of its members" (p. 757).

Apparently accepting this, Judge Waterman would narrow GE's offending, not only with respect to the publicity program but on the whole issue of overall bad faith, to its communicating "that firmness was one of the company's independent policies." The first thing to be said about this is that even if my brother were right, we would not be justified in enforcing the Board's order on that basis. "An administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." S. E. C. v. Chenery Corp., 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943), and the Board's opinion leaned so heavily on the Company's disparagement of the Union that we cannot disregard this on the basis that it would have ruled the same way even had it known it was wrong in its reliance. Moreover, GE certainly could not be sure it would be in compliance if it desisted merely from the one tactic that Judge Waterman condemns. My second difficulty is that his position would seemingly outlaw conduct such as in the cases I have put—where a union "finally" tells workers that it will not take less from one employer than it has won from another or an employer "finally" proclaims he will give no more to one union than he has to another. The third is that if his or the lead opinion implies that GE's publicity got it into a position where it could not yield even if it was convinced that it should, the necessary factual support does not exist. There is no need to repeat what has been said in the previous section of this opinion on that score. I add only, in response to Judge Waterman's proposed rationale, that, as I read the Trial Examiner's report, he made no finding that the publicity had produced any such result. His condemnation of the Company's "finality" campaign referred solely to communications following the resumption of negotiations after the strike vote, and the sense in which he understood the term "finality" is clarified by his statement that "The repeated mentions of the finality of the offer * * * were coupled throughout * * * [this period] with declarations pointing up the inevitable futility of a strike, regardless of its duration, in the light of the Company's policy not to give more *simply* to avert a strike." (Emphasis added.)

Since a policy not to give in just because of a strike is not a violation of § 8(a) (5), I cannot understand why communication of that policy to employees should be. The fact that strikes to coerce acceptance of union demands are "part and parcel of the process of collective bargaining," NLRB v. Insurance Agents' Union, *supra*, 361 U.S. at 495, 80 S.Ct. at 430, does not forbid the employer's doing his best to avoid being coerced by them. This, of course, does not change his duty to continue negotiations and to negotiate in good faith. But so far as economic warfare and vulnerability to it are concerned, the Act allows the parties a maximum of self-protection. No one denies that § 8(c) protects employer communications attempting to persuade employees that they should not strike because the offer fully meets their needs, because union leaders are seeking a strike for personal reasons, or because

a strike will cost too much in lost pay. To prohibit an employer from adding that the mere fact of a strike would gain nothing in the way of further concessions would remove his most important and most relevant argument. Yet this is all that GE's much discussed finality campaign amounted to and, with one insignificant exception, the campaign made the point in the narrowest way it could. GE did not say "If you strike we will automatically lock ourselves into our offer," but only that GE was not deliberately holding anything back and had to be convinced that its original offer was no longer "right" before it would make a change.[8]

It is doubtless true in labor as in other negotiations that the louder people shout, the harder it becomes for them to change their positions without unacceptable loss of face. In that sense any positive public declaration, whether by an employer or by a union, may run counter to the objective of securing industrial peace by promoting agreement. But the Board has been expressly prohibited from promoting peace by restricting speech. Conformably with the dictates of the First Amendment, Congress, when it enacted § 8(c), determined the dangers that free expression might entail for successful bargaining were a lesser risk than to have the Board police employer or union speech.

### IV.

Even if one were to take the benevolent view toward the portion of the Board's opinion and order relating to overall bad faith that is done by the majority, it is beyond debate that if this decision should stand, it would open up wholly new problem areas in the application of §§ 8(a) (5) and 8(b) (3). I cannot perceive any sufficient reason for doing this when, as I see it, the order cannot be enforced in any practical sense and deals with events of half a generation ago.

The only standard of conduct set for GE by the Board's opinion is that a mix of the "fair, firm offer" technique pursued to an unknown point X, plus a communications program pursued to an equally unknown point Y, plus a number of additional items, $Z_1$, $Z_2$, and $Z_3$, is proscribed. This already sufficient confusion is now compounded by the difference in my brothers' efforts at elucidation.

In view of the general obscurity of what GE is and is not permitted to do, the Company could take little comfort from the majority's assurance that it will be given a full opportunity to show it has made a good faith effort at compliance before it is held in contempt. In fact, however, no contempt proceeding could be successfully maintained. For the Supreme Court has very recently declared, in the closely related context of an equitable decree with respect to work stoppages, that "The most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension." International Longshoremen's Ass'n Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967).[9]

The venerable age this case has attained is a further reason for declining to churn up waters that already are troubled enough. We are dealing with an

---

8. I thus cannot accept Judge Waterman's characterization that GE publicized "that as a matter of policy it can never be persuaded to change the advertised terms."

9. Acknowledging the impossibility of enforcing the order as written, and proposing that this court should supply a rationale which the Board's decision lacks, a sympathetic commentator has suggested that the only way to sustain the order would be to "hold single offer bargaining to be an unfair labor practice." Cooper, Boulwarism and the Duty to Bargain in Good Faith, 20 Rutgers L. Rev. 653, 689–692 (1966). But we could not uphold it on that basis even if the evidence supported a finding of "single offer bargaining," which it does not, see SEC v. Chenery Corp., *supra*, 318 U.S. 80, 63 S.Ct. 454. The lead opinion rightly does not do this, and the concurring opinion expressly disclaims any such view.

774

alleged unfair labor practice of *nine years ago*. Four years were taken by the Board to render a decision—itself some indication that Congress never intended to impose any such "herculean task." Passing over the two years spent in quarrels in the courts over venue and the Union's right to intervene, three more elapsed before the case was argued to us. Since then there have been two further negotiations, in 1963 and 1966. Another, in which the IUE's bargaining position has been significantly bolstered by a decision of this court in which I joined, General Electric Co. v. NLRB, 412 F.2d 512 (1969), is now in progress. Although the unions have called a strike and filed unfair labor practice charges, in part because of GE's adhering to a "fair, firm offer" of a first year increase less than the unions sought and with annual wage reopeners instead of automatic increases, many of the principals in the 1960 negotiations are no longer on the scene and it is scarcely possible that the Company's actions are so nearly parallel to those of 1960 that an order in this case, even had it been made earlier, would have supported a contempt proceeding.

I am well aware of the Supreme Court's statement that "Congress has introduced no time limitation into the Act except that in § 10(b)," NLRB v. Katz, 369 U.S. 736, 748, 82 S.Ct. 1107, 1114, n. 16 (1962). Still, as it seems to me, a court must have some discretion to decline to enforce a Labor Board order relating to practices nearly a decade in the past when, as here, the parties have engaged in bargaining, any harmful effect of the alleged unfair labor practice has been dissipated, the case was one of first impression, and there has thus been no "stubborn refusal to abide by the law." Franks Bros. Co. v. NLRB, 321 U.S. 702, 705, 64 S.Ct. 817, 819, 88 L.Ed. 1020 (1944).

In conclusion, I respectfully suggest, as Judge Burger did in United Steelworkers of America v. N. L. R. B., *supra*, 390 F.2d at 858, "that today's holding contains the seeds of danger for unions in their col-

lective bargaining rights" as well as for employers in the exercise of theirs. It constitutes also a serious indentation of § 8(c) and (d), if not, indeed, of the First Amendment. For the reasons I have indicated, I believe the majority's decision to be deeply mistaken—the familiar instance of a hard case producing bad law. In any event, I think that, because of the confusion as to what the Board's order means and the lapse of time, the case is exceedingly inappropriate for taking such a portentous step.

I would grant enforcement with respect to the failure to furnish information and the bargaining with locals, and would otherwise deny.